| TRAYLOR, Justice.
We granted certiorari in this matter to consider whether the district court below erred in granting a judgment notwithstanding the verdict which held that the jury award returned was “abusively low,” and whether the court of appeal erred in affirming the judgment notwithstanding the verdict. For the reasons assigned, we reverse.
FACTS and PROCEDURAL HISTORY
Cassandra Robinson was a nurse manager working in the emergency room of the Savoy Medical Center in Mamou, Louisiana. Chantelle Fontenot worked for Dr. McGee, an emergency room doctor who saw his regular patients at the hospital when he had emergency room duty. On December 18, 1997, Fontenot spilled ice on the emergency room floor, upon which Robinson slipped and fell, injuring her sacroiliac joint (SI joint).
Following her injury, Robinson missed work until March 18, 1998, at which time she returned to “light duty” work. Robinson continued to work for two months, | ¡.until May 26, 1998, when she bent over to pick up a toy and experienced pain similar to that she had suffered following the slip and fall five months earlier.
Following the second incident, Robinson did not return to work, experienced several hospitalizations due to pain, and eventually underwent an SI joint fusion. Her doctors agree that she cannot return to work as a nurse with direct patient care responsibilities.
At trial, the jury returned a verdict assessing Robinson ten percent fault and Fontenot ninety percent fault. The jury assessed the total amount of damages that Robinson had suffered as $38,107.50 for physical pain and suffering, $38,107.50 for mental pain and suffering, $12,171.08 for past medical expenses, and $11,614.00 for past loss of earnings. The jury did not award any amount for future loss of earnings or future medical expenses. The total of the jury award was $100,000.08.
The trial court, finding the jury’s award “abusively low,” granted plaintiffs motion for judgment notwithstanding the verdict (JNOV) and awarded $200,000.00 for future pain and suffering, $116,713.92 for past medical expenses, $20,000.00 for future medical expenses, $131,170.47 for past lost earnings, and $707,215.00 for loss of earning capacity. The trial court’s judgment awarded $1,174,921.39.
Defendants McGee, Fontenot, and State Farm appealed, arguing that the trial court had erred in granting the JNOV. The court of appeal affirmed the JNOV, stating that “the evidence so overwhelm *1282 ingly favors the finding that Robinson’s May 1998 incident was related to her December 1997 fall that no reasonable jury could reach a contrary verdict.” Defendants then applied to this court for review of the decisions below.
DISCUSSION
Defendants argue that both the trial and appellate courts improperly substituted | stheir judgment for that of the jury, first in rendering and then in confirming the JNOV. Defendants point out that a central issue in the trial of the matter was whether or not the incident which occurred on May 26, 1998, when Robinson bent over to pick up a toy, was a new injury, or simply an aggravation of the injury she had sustained on December 18, 1997. The jury, they argue, could reasonably have determined that the May 26 injury was a new injury not related to the December injury, and that the damages from the initial injury ended when Robinson returned to work on March 18, 1998. They point out that the jury award was exact to the penny as to Robinson’s lost wages and medical expenses during the period between the December 18, 1997, injury and the May 26, 1998, injury. In support of the jury’s verdict, defendants point to medical testimony by two physicians regarding their opinions that the May 1998 injury was a new injury.
Plaintiff, on the other hand, argues that because all of the physicians who treated Robinson on more than one occasion were of the opinion that the May 1998 injury was an aggravation of the December 1997 injury, and because those physicians believed that the x-ray evidence supported that finding, the JNOV was proper. Plaintiff further argues that the jury award shows that the jury was confused, and that the verdict was based upon improper and prejudicial conduct.

Law and Analysis

As an initial matter, we take up plaintiffs argument regarding improper and prejudicial conduct by defendants. Plaintiff complains that one of defendants’ trial counsel referred to plaintiffs filing of a claim against her employer, an action contrary to Article 414 of the Code of Evidence. The reference complained of occurred during defendants’ impeachment of plaintiff, and may be found at page 768 of the record:
Q. Do you remember giving your deposition in another matter in this case?
|4A. I gave ... three depositions. You’ll have to point out which one your [sic] talking about.
Q. Well, you also gave a fourth deposition in this case in regard to a claim against Savoy Medical Center, isn’t that true?
Plaintiffs counsel immediately objected and asked for a conference outside the presence of the jury. The attorneys and the trial judge moved into the judge’s office and discussed the matter. Upon returning to the courtroom, the substance of the discussion was not entered into the record and the trial judge did not rule on the objection on the record. On July 17, 2002, after this court had granted writ of certiorari in the matter, the trial judge signed a “per curiam” order which acknowledged plaintiffs objection, the trial judge’s ruling in favor of the objection, and the trial judge’s admonishment to defendants’ counsel that they had been warned prior to trial to make no reference to the compensation claim and that any further reference to the claim would result in a mistrial. The order states that it “shall become part of the official Court record of this matter.”
Whether the trial court did or did not have jurisdiction to publish such an order is of no moment. Plaintiff apparently got *1283 the relief she asked for: plaintiffs counsel made an objection, the court granted the objection off the record and admonished defense counsel off the record. If plaintiff had wanted the trial court to admonish the jury to disregard the question, plaintiff could have done so; however, it is incumbent upon counsel to request the action he or she desires the court to take. C.C.P. art. 1635. Plaintiffs counsel requested neither a jury admonishment nor a mistrial, either on or off the record. Plaintiff does not raise an error which this court could repair, even were it inclined to do so.
Article 1811 of the Louisiana Code of Civil Procedure authorizes a trial court to grant a JNOV on either the issue of liability or of damages or of both. This court has previously explained the standard for the issuance of a JNOV, and for review of La granted JNOV:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Davis v. Wal-Mart Stores, Inc., 2000-0445 (La.11/28/00); 774 So.2d 84, 89.
Because the jury verdict awarded exactly to the penny the damages that plaintiff had proved for the period between the two incidents, we believe that it is clear that the jury determined that the May 1998 injury was a new injury and not related to the December 1997 slip and fall. Initially, then, we must examine the record to determine whether or not there was sufficient evidence in the record to support the jury’s finding that the second injury was a new injury.
Dr. Lippett, a board certified orthopedic surgeon who performed plaintiffs SI joint fusion surgery was of the opinion that merely bending over and flexing as plaintiff reportedly did to precipitate the May 1998 incident was enough to cause an SI injury and that the May 1998 injury was a new injury. He testified at trial by video deposition entered into the record. The deposition reveals the following exchanges, on page 22:
Q. When you talk about the trauma that can precipitate that kind of pain in the SI joint, it’s not necessarily some accident? I think you mentioned to us earlier that it can be from bending over and flexing and twisting, that type of motion; isn’t that also correct?
A. Well, that is an injury, and that’s a very common cause of tearing of the ligaments and problems with the SI joint, yes.
and on pages 23-4:
|fiQ. Now, in the history that she provided to you, she told you that in — that following the December 1997 slip and fall, she did bend over and pick something up that resulted in her back locking up; isn’t that correct?
A. Yes.
Q. That can also be a precipitating cause of an injury to the SI joint; isn’t that true?
A. Yes.
*1284 Q. And isn’t it correct, Doctor, that bending over to pick something up can cause the ligaments around the sacral iliac joint to tear?
A. That’s correct. And I think that’s what happened in this particular case.
The above testimony, given all inferences which tend to favor the non-movant, clearly supports a finding that the May injury was a new injury.
Prior to Dr. Lippett’s testimony being shown to the jury, the jury had heard plaintiff admit that she had had several other back injuries and had suffered other accidents and incidents: in 1993 she slipped in IV fluid and hurt her back; she had a left SI joint injection during pregnancy; in 1994 she suffered severe upper right quadrant pain radiating into her back; in January 1997, she reported severe upper right quadrant pain radiating into her back; she suffered a trip and fall in 1996; she was involved in a car accident in February 1998; she was a victim of domestic violence in March of 2000 and was knocked down; and was again a victim of domestic violence July 2000 when she was battered and dragged across parking lot. With the preceding facts known to the jury, and admitted by the plaintiff, the following exchange likewise supports the jury verdict, on page 29:
Q. Now, given — and I’ll need you to accept this as true because you don’t have personal knowledge of it. But if you assume the 1993 fall in the hospital on that area, the 1995 injury to her left SI joint and for which she receives an injection and a fall of 1997, all of which she returned to work from, wouldn’t it make it more likely that the 1998 incident where she bent over and picked up a toy from which she was not able to return to work, was a new injury?
A. It sounds like it was, yes.
^Finally with regard to Dr. Lippett’s deposition, plaintiffs counsel tried several different questions to “rehabilitate” his testimony, but the doctor finally said on page 34 of his deposition, “I still am not clear as to the question. I’m sorry. Based on the information available to me, the incident in [May][1] of 1998 was a new injury. But it certainly could have been an aggravation of a significant preexisting condition.” Again, this testimony, given all reasonable inferences, supports a jury finding that the two incidents were unrelated.
There is other evidence which likewise supports the jury’s verdict. Dr. Foster, a board certified orthopedic surgeon who testified in court as an independent medical examiner, discussed in his testimony plaintiffs previous injuries, her “tough” pregnancies, and the fact that plaintiff had received a left SI joint injection in 1994. Dr. Foster testified at length about whether the May, 1998, incident was a new injury. When asked of his opinion as to whether or not the incident of May, 1998, was a new injury, he stated, “I feel that the incident of May, 1998, uh ... was another aggravation or another injury to the SI joint that was initially injured during childbirth.” R. at 1006. When asked how the May injury could be a new injury to the plaintiff, Dr. Foster explained:
I think it’s ... I think what we have to look at is cumulative trauma to this type of joint because she had degenerative changes in the two CT scans that I saw. Uh ... during childbirth uh ... when they are vaginal deliveries, not a cesarean section. The pelvis uh ... has to open up to allow the baby to pass through and by opening up, the front *1285 part of the pelvis, which is ... which is what we call the pubic symphysis. This is a cartilage rem [sic] with ligaments, so it’s allowed to spread apart so that the child can pass through the birth canal. This, also, these ligaments in the front of the SI joint must also move, in other words they must stretch to a certain extent. Now, I’ve seen in my practice women that have injured the SI joint or actually fractured their tailbone during childbirth because of the force of the pelvis spreading apart, so when | «[plaintiff] had her initial injury uh ... that required an injection into that joint, evidentially [sic] the joint had been stretched more than it was supposed to during childbirth. When she ... she had relief of that pain after the injection. When she slipped and fell again she had some type of trauma whether it was micro trauma or major trauma, but it was probably more major in the fact that, that’s a rigid joint, but it was enough to open it or move it just a millimeter or two, uh ... particularly with the fact that she already had some degenerative changes going on. It then calms down. It’s like any other joint that has arthritis in it. You can have recurrent injuries where you have swelling and tenderness, um ... and then it’ll go away. It’ll get better and it’ll calm down. Then you can do something very simple again, such as bending over, which requires the spine to move, and if that’s an abnormal joint, meaning there’s arthritis in there, if it goes to move on you then you can have a new injury to that joint, uh ... and that’s what I feel caused the need for surgery. R. at 1007.
Dr. Foster was also asked his opinion regarding plaintiffs treatment following the May incident. Having already expressed his opinion that the December 1997 and May 1998 incidents were unrelated, Dr. Foster replied, “I feel that the May incident is the reason for her continued treatment and the ultimate treatment of an SI joint fusion.”
Although plaintiffs treating physicians, with the exception of Dr. Lippett, were of the opinion that the May and December injuries were related, another of them gave testimony which would support the jury verdict. Dr. Nason, a board certified orthopedic surgeon, testified on page 17 of the transcript of his video deposition:
Q. Did she give you a history of her condition between February and that date [May 28, 1998] how she had been doing?
A. She did state that she had steadily but slowly improved with her symptoms over this three and a half (3 1/2) month period, and that for the month prior to this time, she had been doing well and was able to be fully active ...
Dr. Nason also confirmed the testimony of Doctors Lippett and Foster on page 29 of his deposition, in that he stated that a sacroiliac injury such as plaintiff suffered in May could be caused simply by bending over:
Q. But that was the type of activity— lifting something — that could cause an additional injury to her back?
A. Merely the act of bending over is enough to cause that.
Q. Okay. But picking up something, on top of that, is certainly 1gsomething that can cause her injury?
A. Yes.
Finally, Robinson herself offered testimony to support the jury verdict. On page 778 of the record, when asked if it was true that she started having problems with her left SI joint after the May injury, she stated, “Uh ... yes, sir.” When asked if she had had any problems with her left SI joint between the December and May injuries, she stated, “No.” When asked if *1286 that was a new complaint, she replied, “I think it was, yes, sir.”
It is clear that there was ample evidence adduced at trial to allow “reasonable and fair-minded men in the exercise of impartial judgment” to determine that the May 1998 injury was not related to the December 1997 injury. Apparently, by arguing that all of the physicians who treated on more than one occasion were of the opinion that the May injury was related to the December incident, plaintiff would like for this court to take into account the credibility of those witnesses. This we cannot do. As we stated in Davis, “the court should not evaluate the credibility of witnesses and all reasonable inferences should be resolved in favor of the non-moving party.”
The court of appeal quoted certain testimony by Doctors Lippett and Foster, but disagreed with defendants’ assertion that the jury could have reasonably inferred from that testimony that the May incident was a new injury. The court of appeal opined, “Neither of the statements relied on by the Defendants is definitive. In contrast, the physicians who treated Robinson on a regular basis agree unequivocally that the May 1998 incident was an aggravation of the December 1997 accident.” Robinson v. Fontenot, 2001-0975 (La.App. 3d Cir.2/6/02); 815 So.2d 904, 908. It is apparent from these statements that the court of appeal, by pointing out the testimony of the “treating physicians,” not only made its own credibility determination, but also, in requiring “definitive” assertions by Doctors Lippett and Foster, failed to resolve all 1 inreasonable inferences in favor of the non-movants. Were definitive statements required, no inferences would be needed.
Robinson further argues that the x-ray evidence provides “objective radiographic evidence” showing “that the fall caused marked sclerotic changes in the right SI joint only,” and because there are no “credibility issues with x-rays,” this evidence is enough to override the evidence supporting the jury’s verdict. The x-ray evidence at issue, however, is not as clear cut as the plaintiff maintains. The December x-ray (actually a series of CT scans)was focused on the lower back, but did show some of the upper left and right SI joints. Dr. Foster testified that the films showed “some degenerative changes of the left SI joint with some cystic changes, and also of the right SI joint was some cystic changes that were present.” R. at 998. Dr. Foster continued his testimony as to the May CT, stating, “Um ... on those they were more specific to the SI Joint, itself, uh ... I felt they showed the same degenerative changes uh ... as the one on December 18th, and then these ... because these were cuts of the SI Joint, they went further down into the joint, which did show degenerative changes of the S ... right SI joint, and also the left, but worse on the right side.” R. at 999. As to the conclusion he drew from a comparison of the scans, Dr. Foster said, “[T]he changes were essentially the same uh ... because I did not ... could not view further down the SI Joint on the December films then I knew ... could not compare them exactly. R. at 999-1000. Dr. Foster continued, “I felt that she had had an aggravation of a chronic, or ... or a chronic SI problem,” and agreed that “the December fall was an aggravation of [a] prior incident.” R. at 1000. There is, therefore, contradictory evidence regarding the “x-rays” and what they are able to prove. What all of the physicians do agree on, however, is that both the December and May scans show damage in both the left and right SI joints.
| nPIaintiff also argues that although the jury awarded the exact amounts which plaintiff proved as damages for the period from the December 1997 accident until plaintiff returned to work in March, the *1287 jury was confused because it awarded amounts- for physical pain and suffering and mental pain and suffering that plaintiff did not prove and was not entitled to. Because of this confusion, plaintiff says, the trial judge was justified in granting the JNOV in favor of plaintiff. To the contrary, there is no doubt that the jury verdict awarded to the penny the amounts for past medicals and past wages to which plaintiff was entitled prior to the second accident. The jury was not confused as to those amounts. The only confusion contained in the jury verdict seems to be with regard to physical and mental pain and suffering and the proper amount to be awarded for a three-month aggravation of a lower back injury. Because defendants have neither raised nor argued the issue, the awards for those items of recovery must stand.
DECREE
For the foregoing reasons, the ruling of the court of appeal is reversed. The matter is remanded to the trial court for entry of judgment in accordance with the jury verdict and this opinion.
REVERSED AND REMANDED

. The transcript of Dr. Lippett's video deposition indicates that he said "... the incident in March of 1998 was a new injury.” There having been no March incident, apparently the doctor was referring to the May incident.