WILLIAMS, J.
hln this tort action, the trial court granted judgment notwithstanding the verdict (“JNOV”) in favor of the plaintiff and increased the total award of damages from $46,500 to $96,291.57. For the following reasons, we affirm.
FACTS
This matter arises out of a tragic automobile accident that occurred in Ouachita Parish on June 26, 2013. Da’Veion Bailey, who was 11 years old, was a passenger in a vehicle being driven by his godmother, Lakita Lavender. Lavender’s son, DaSh-awn Wilson, was also a passenger.
Lavender, DaShawn and Da’Veion left Lavender’s home at approximately 7:00 a.m., and traveled south on Louisiana Hwy. 594. The defendant, Alice Simmons, was also traveling south on Highway 594, directly behind Lavender. Simmons unsuccessfully attempted to pass Lavender’s ve-hide. As Simmons was returning to her lane of travel, she “clipped” the bumper of Lavender’s vehicle, forcing Lavender off the road. Lavender’s SUV struck a culvert and rolled over multiple times before coming to a stop. Lavender, who was not wearing a seatbelt, was ejected from the vehicle; the vehicle came to a rest on top of her. Lavender was pronounced dead at the scene. Da’Veion and DaShawn were transported to St. Francis Medical Center via ambulance. Da’Veion suffered soft tissue physical injuries and extensive mental injuries. DaShawn suffered serious physical injuries, including a broken arm.[1]
|aOn April 14, 2014, Da’Veion’s mother, Sommer Terry, filed a lawsuit, individually and on behalf of Da’Veion. Terry sought damages for past and future. medical expenses, physical pain and suffering, emotional distress, mental anguish and loss of enjoyment of life sustained by Da’Veion as a result of the accident. The plaintiff named Simmons, her husband, Zachary Simmons,[2] and their automobile insurer, ANPAC Louisiana Insurance Company, as defendants.
A jury trial was held on March 24-27, 2015. During the trial, multiple witnesses testified, including Simmons, Da’Veion, his mother, a Louisiana state trooper,[3] and an eyewitness to the accident. Da’Veion’s treating clinicians—Addie Morris, a family nurse practitioner, Dr. Dan Holt, a chiropractor, Dr. Rita Agarwal, a psychiatrist, and Dr. Beatrice Tatem, a licensed professional counselor—also testified. Additional *415 ly, Da’Veion’s medical records, bills and expenses were introduced into evidence at trial.
Andrea Wright testified as follows: she was driving behind Simmons at the time of the accident; she and Simmons had been neighbors for “some years”; she did not know Lavender or the plaintiff; she saw Simmons attempt to pass Lavender’s vehicle and she saw Simmons “clip” Lavender’s vehicle as she attempted “to get back over into the proper lane”; she saw Lavender’s vehicle roll over “maybe three” times before it landed “into somebody’s yard”; she called 9-1-1 from her cellphone before she exited her | ¡¡vehicle; she observed Lavender lying on the ground and she heard Da’Veion and DaShawn “screaming for help”; she was on her way to assist Da’Veion and DaShawn, but other bystanders assisted them out of the rolled over vehicle before she could get to them; she checked on Da’Veion and DaShawn and they were “really scared”; she remained on the scene for approximately two hours; and she did not remember if the investigating officer approached Da’Veion.
The defendant, Alice Simmons, first testified on cross-examination. She testified as follows: she attempted to pass Lavender in a no-passing zone because Lavender was “going slow”; she increased her speed in an attempt to pass Lavender, but she does not know how fast she was traveling; after the vehicles collided, she witnessed Lavender’s vehicle hit the culvert and “flip over” and land on .its side; she only saw the vehicle flip once; she called her husband, but she did not call 9-1-1; she was “frantic and crying”; she did not hear Da’Veion and DaShawn screaming or crying; she did not see Wright attempting to console the boys; and she relives the accident every time she passes the area.
On direct examination, Simmons testified that she was in a passing zone when she initiated the attempt to pass Lavender, but “before I knew it, [I] was in a no passing zone when the accident happened.” Simmons also testified that Lavender seemed to “speed up” as she was attempting to pass her.
Da’Veion testified as follows: he was 11 years old at the time of the accident and 13 at the time of trial; Lavender was his godmother and was like his “second mother”; he was a rear passenger in Lavender’s vehicle; a black truck attempted to pass them; Lavender’s vehicle “flipped over at least | ¿three to four times”; Lavender “had flipped out” of one of the windows of the vehicle and the vehicle “landed on her head”; a man helped him and DaShawn out of the vehicle; his eyeglasses were broken during the accident; he was upset at the scene; he, DaShawn and his stepfather went to the emergency room at St. Francis; his mother stayed at the scene with Lavender; he was crying and upset in the ambulance on the way to the hospital; the doctors at the hospital attempted to examine him, but he was “upset and crying”; the day after the accident, his mother took him to the All Kids R Us clinic because he was experiencing pain in his back, neck and ribs; he was sent to Glenwood Regional Medical Center for X-rays; he was eventually evaluated and treated by Dr. Holt; he treated with Dr. Holt for approximately three months; the chiropractic treatment “helped”; he was not having back, neck or shoulder pain before the collision; he started having pain “the very next day” after the accident; when he went to All Kids R Us the day after the accident, he told the nurse practitioner that he had a headache; he does not remember what treatment the nurse provided for his headache; after the accident, he stopped participating in activities with his family and started “staying to [himself]” in his room; he tried “to put the *416 accident out of his mind”; after the accident, he began having “gruesome” nightmares which required his mother to come to his room to comfort him; at the time of trial, he was still taking “sleep medication” to help with nightmares he suffers because of the accident; he began “zoning out or spacing out” because the accident was the only thing he could think about; he takes medication every night; he began attending therapy sessions with Dr. Beatrice Ta-tem; he believes the therapy was beneficial; and the accident does not bother him “quite as much” anymore.
|sOn cross-examination, Da’Veion testified that the accident happened during the summer, and he participated in football when he returned to school in August. He also testified that he talks to his counselor, Dr. Tatem, “mainly about the wreck.”
Sommer Terry, Da’Veion’s mother, testified as follows: she and Lavender were close friends; Da’Veion had spent the night at Lavender’s house the night before the accident; on the morning of the accident, Da’Veion called her and told her that they had been “in a wreck”; Da’Veion “was crying so bad he couldn’t tell [her] where he was”; she heard someone in the background say, “[Highway] 594”; she lived approximately three minutes from the scene of the accident; she arrived at the scene and saw Lavender’s SUV “flipped over”; her primary concern was “getting to” Da’Veion; she ran to Da’Veion and did not see any “blood or anything”; she saw that DaShawn “was bloody”; she attended to DaShawn first because she knew Da’Veion “was okay at that time”; her determination that Da’Veion was “okay” was based upon her visual inspection of him at the time; the accident scene was “chaotic”; initially, she did not know Lavender was deceased; after assessing the scene, she called her husband and told him that she “needed him to come right now”; she and Da’Veion attempted to “calm down DaShawn”; when the ambulance arrived, Da’Veion and DaShawn did not want to leave Lavender; her husband persuaded Da’Veion and DaShawn to get into the ambulance and told them he would meet them at the hospital; she remained at the | (¡scene with Lavender; she allowed Da’Veion and DaShawn to leave without her because she knew they would “be in good hands” with her husband; a police officer informed her that Lavender was deceased after Da’Veion and DaShawn left the scene; she remained at the scene until Lavender’s body had been removed because she “was the only family there”; when she left the scene, she picked Lavender’s daughter up from summer school and they went to the hospital where Da’Veion and DaShawn had been transported; the doctors had already assessed Da’Veion by the time she arrived; DaShawn was the primary focus of the medical staff because his physical injuries were more severe; Da’Veion was more concerned about DaSh-awn than he was about himself; when they left the hospital, her husband took Da’Veion home and she took Lavender’s daughter to her grandmother’s house;[4] when she arrived at her house later that day, Da’Veion would not talk to anyone or come out of his room and he would not stop crying; Da’Veion kept repeating, “|T]t’s my fault she [is] dead”; Da’Veion blamed himself for Lavender’s death because she was taking him home when the accident occurred; she stayed in Da’Veion’s room with him the first night but she was unable to console him; he cried himself to sleep that night; the following day, Da’Veion began complaining of headaches; she gave him Tylenol, but his headache did not improve; she decided to *417 take Da’Veion to the All Kids R Us pediatric clinic when he began to complain of pain in “his side”; the All Kids R Us clinic was Da’Veion’s primary care provider; she told the staff at the clinic that Da’Veion had been in an automobile accident the previous day; the clinician sent Da’Veion to Glenwood Regional Medical Center for X-rays of his back; the medical staff told her to bring Da’Veion back to the clinic if he continued to have pain; Da’Veion never complained of pain or headaches prior to the accident; she decided to take Da’Veion to a chiropractor because 17she “thought it would be best for him ... because he kept talking about his shoulder was—felt like they were tight”; prior to the accident, Da’Veion was “hyperactive”; after the accident, she noticed “a big change” in him; she took Da’Veion back to All Kids R Us on July 5,2013, because she was concerned that he “wasn’t himself’; Da’Veion continued to complain of pain in his ribs and right side; he also continued to emotionally “withdraw” and stay in his room most of the time; she did not know what to do, so she called the clinic and the staff told her to bring him back; she took Da’Veion back to the clinic several times for complaints related to the accident; she also took Da’Veion to his ophthalmologist, Dr. Gerald Broussard, because she needed to replace his eyeglasses, which were broken in the accident; Da’Veion continued to have difficulty sleeping, had “weeping spells,” exhibited signs of depression and demonstrated an inability to concentrate; at the time of the trial, Da’Veion was still taking medication prescribed by Dr. Agarwal, the psychiatrist; the medication seemed to help; when Da’Veion began to go to Dr. Agarwal, he would not talk to her; he eventually began to “open up” during his sessions with the counselor, Dr. Tatem; at the time of the trial, Da’Veion was seeing Dr. Agarwal once a month and Dr. Tatem “four or five times a month”; Da’Veion continues to have nightmares; he did not have nightmares prior to the accident; Da’Veion’s nightmares continued even after the family moved to another house; her family was impacted by the accident; and the accident and Da’Veion’s subsequent issues could have contributed to the breakup of her marriage. On cross-examination, Terry testified that Da’Veion’s medical bills had been paid by Medicaid.
Addie Morris, a family nurse practitioner at the All Kids R Us clinic, testified as follows: she treated Da’Veion on June 27, 2013, for complaints | sof muscle “soreness” and pain in his right ribcage area; Da’Veion denied pain upon palpation; she recommended “warm water soaks” for the soreness and Ibuprofen or Tylenol for pain; she discussed counseling “off to the side” with Da’Veion’s mother; she told Da’Veion’s mother to follow up one week later, or sooner if any problems arose; Da’Veion returned to the clinic on July 5, 2013, for a follow-up visit; he continued to complain of pain in his right chest and ribcage area; she ordered X-rays of the ribs; the X-rays were negative for rib fractures; Da’Veion returned to the clinic on September 26, 2013, for “behavior issues” which had “increased in past the few months since child was involved in [motor vehicle accident]”; Da’Veion’s mother had taken him to a psychiatrist and a counselor but he was still having “behavior issues” and “increased anger”; she recommended counseling for Da’Veion;[5] and on April 15, 2014, Da’Veion returned to the clinic complaining of “headaches [to] the back of the head, the occipital area and that Advil was not working.” On cross-examination, Mor *418 ris testified that Da’Veion did not have any visible bruises or abrasions when he came to the clinic the day after the accident.
Dr. Dan Holt, a chiropractor, testified as follows: Da’Veion presented to his clinic on July 1, 2013, complaining of “headaches, neck pain, neck stiffness, upper back pain, left and right shoulder pain, mid back pain and lower back pain”; Da’Veion stated that his symptoms began after the automobile accident; Da’Veion also reported the “inability to concentrate [or] focus, confusion, sleeping problems, depression, weeping spells, |flnervousness, anxiety, tension, fatigue ... loss of appetite, neck stiffness, tightness, muscle spasms, tightness] and sore[ness]”; the goal of chiropractic treatment is to “comfort the body” through therapies and treatments, with a “focus on the spine, the neck through the lower back and then those nerves go all through the body so we can have an influence and effect of comforting the whole body through focusing on the spine”; during his physical examination, he palpated Da’Veion’s back and noted “restriction and tightness” in his cervical and thoracic spine; Da’Veion’s “whole back was tight and restricted and sore and stiff’; he palpated Da’Veion’s back and noted that he was experiencing muscle spasms throughout his back; the orthopedic examination revealed that Da’Veion was experiencing pain during flexion, extension and rotation of his lower back; Da’Veion’s treatment plan included chiropractic adjustments, mobilization of the cervical/thoracic lumbar area to reduce muscle spasms and increase joint dysfunction, ice to decrease inflammation, heat to increase blood flow, electrical muscle stimulation to restore muscle tone and reduce spasms, percussion massages to promote muscle relaxation and increase blood flow, myofascial technique to stretch the myofascial part of the skin and the muscle attached to it to loosen up the body; he treated Da’Veion for three months; and he concluded that the injuries were caused by the automobile accident because Da’Veion did not have any preexisting factors.
On cross-examination, Dr. Holt testified that he did not recall being aware that Da’Veion was a member of a junior high school football team when he was receiving his chiropractic treatment. He also testified that plaintiffs counsel was “one of the lawyers [he had] worked with over the years.”
hnDr. Rita Agarwal, Da’Veion’s psychiatrist, was accepted by the trial court as an expert in the field of psychiatry. Dr. Agar-wal testified that she has a private practice and she provides psychiatric treatment to patients for the Macro Group.[6] Dr. Agar-wal testified as follows: Da’Veion presented to the clinic at the Macro Group on July 10, 2013, because he had been involved in an automobile accident; Da’Veion (or this mother) reported that, since the accident, he had been “crying a lot, he would zone out, he was not playing games, isolating from others, does not want to be bothered”; she noted that Da’Veion also reported that he was experiencing back pain; Da’Veion was diagnosed with post-traumatic stress disorder (“PTSD”) because he had been exposed to stress “related with the accident and death of his godmother and witnessing the accident where he was himself involved and he saw other family members or friends get involved”; Da’Veion reported nightmares in which he believed he was “going to die”; he had *419 difficulty returning to sleep after the nightmares; during the initial visit, Da’Veion was “tearful and sad” and he “did not talk too much, which is a common sign of PTSD, anxiety, worries, [and] depression”; Da’Veion also exhibited symptoms of “survivor’s guilt”; she prescribed Clonidine, a medication often prescribed for symptoms of anxiety, “to help with the nightmares,” and Zoloft, an antidepressant, “to help with PTSD and depression symptoms”; Da’Veion’s PTSD, depression and survivor’s guilt were related to the accident; during the following visits, Da’Veion continued to report that he was experiencing nightmares and episodes of crying; 1 1 ¶ Da’Veion exhibited “depressed mood,” “flat depressed affect” and appeared to be “zoned out”;[7] Da’Veion’s mother expressed concerns about the medication he was taking, so she prescribed Doxepin, a different antidepressant, “to help with sleep”; over the course of time, Da’Veion improved, but would sometimes have periods of acting out in school; Da’Veion had seen a counselor prior to the accident for unspecified “behavior problems”; prior to the accident, Da’Veion would get into trouble at school for “talking a lot”; after the accident, he began to exhibit more disruptive behaviors, such as getting into fights, cursing other children, pushing a teacher and failing classes; Da’Veion’s anger and disruptive behavior can be symptoms of PTSD, depression and “feeling insecure”; she prescribed an additional medication “to help him with anger”; children with depression and PTSD are encouraged to participate in school activities, such as team sports, because those activities are “self-esteem building” and prevent children from “isolating and reminiscing about” traumatic experiences; Da’Veion’s recovery has been a “roller-.coaster” because he would do “well for months” and then revert to the same behaviors; and the accident was “real traumatic for [Da’Veion]” and he continued to exhibit signs of depression, fearfulness and agitation.
On March 18, 2015, Dr. Agarwal made the following recommendation: “I recommend that Da’Veion Bailey continue to receive counseling [until] his 18th birthday because he has gone through some serious traumatic event [sic]. He need[s] weekly counseling and medication | ^management once every month.” On March 20, 2015, Dr. Agarwal prepared a report in which she stated:
I recommend that Da’Veion Bailey see a counselor once a month along with taking psychiatric medication for the next four years. [The] June 26, 2013 injury caused the psychiatric injury of major depression and post-traumatic stress disorder, which require intervention for the next four years. Technique used by the counselor would include psychotherapy, cognitive behavior therapy, cognitive support along with workbook.
On cross-examination, Dr. Agarwal testified that she began treating Da’Veion approximately two weeks after the accident and her services were provided through her contract with the Macro Group. She stated that during the initial consultation with Da’Veion, his memory of the accident was “still fresh” and he was quiet. Over time, he exhibited signs of improvement, ie., he began to sleep better, his communication and interaction with his family improved, and his behavior at school improved. Dr. Agarwal also testified that she was aware that Da’Veion had been suspended from school prior to the accident *420 but she did not know the reason for the suspension. She also testified that Da’Veion had received a failing grade on his report card prior to the accident. Further, Dr. Agarwal admitted that in January 2014, she recommended that Da’Veion receive psychiatric treatment “for about another year” and that she would wait until a “later date” to determine his need for future treatment. Additionally, during cross-examination, the following colloquy occurred:
Q: [I]s it possible for a thirteen year old kid, without an emotional issue, without a diagnosis, to misbehave on occasion, maybe even get suspended from school?
A: [M]ost of the kids they like to be liked, like to behave, they want to please their mother, they j iswant to please their teachers and their peers. When they are in distress[,3 something happens, they are being depressed, they act out more than normal and this child has been traumatized, he has been depressed, he has gone through lot of traumatic event [sic].
***
And—and this child has gone through a traumatic event and he’s not feeling secure. He feel[s] numb and he doesn’t know how to express himself. And that’s what is happening to this child.
Dr. Agarwal also testified that many children Da’Veion’s age get suspended from school “once in a while but not long lasting.” Further, she stated that it is doubtful that Da’Veion’s condition will “improve in a month,” explaining as follows:
[T]hose who have lost family members, close relatives involved in a major accident, when [their] mind is growing, it affects them more than a mature adult. So at this time of age, I want him to be at a counseling program where he can get counseling because he’s going through [the] adolescent phase and then he is having this baggage of this trauma. And we know with the past what happened to the children that you get affected by th[is] traumatic event. We want him to do better. I want him to be—not get isolated and put him somewhere. *** So he needs support, family needs support and child need[s] medication and counseling to help him grow up a normal person.
Dr. Beatrice Tatem, a licensed professional counselor, testified as follows: she has a private practice but subcontracts with the Macro Group; she coordinated with Dr. Agarwal to provide treatment for Da’Veion; she began counseling Da’Veion “to address issues dealing with grief and loss, to deal with confusfion] ... conflict, survivor’s guilt, to deal with some of the depression that he’s experiencing as a result of it and some of the PTSD”; Da’Veion was “very, very quiet, very soft spoken,” “traumatized” and “sad”; |14and over time, Da’Veion opened up more and began expressing his emotions.
Following the trial, the jury concluded that Simmons was 100% at fault for causing the accident. The jury also specifically found that Da’Veion sustained injuries that were caused by the accident. The jury awarded damages totaling $46,500 ($2,500 for past medical care and expenses; $5,500 for future medical care and expenses; $35,000 for general damages—mental pain and anguish and physical pain and suffering; and $3,500 for loss of enjoyment of life).
Subsequently, the plaintiff filed a motion for JNOV, or in the alternative, for additur or new trial.[8] The plaintiff argued that the *421 jury’s verdict was contrary to the law and evidence with regard to the award of damages. The defendants responded, arguing that the jury’s verdict was correct and the motion for JNOV, additur and/or new trial should be denied.
On May 27, 2015, the trial court conducted a hearing on the motion. Prior to receiving argument from counsel, the trial court conducted a “pretrial conference” to discuss the “court’s general views with regard to this matter before we do the hearing.” When the hearing resumed, the trial court stated that after conferring with counsel, it would take the matter under advisement. The court also stated that it was “inclined to” deny the motion for JNOV and that it was the court’s “inclination that a new trial was | ^warranted based upon the court’s view and the totality of the testimony and the evidence that was presented during the course of the trial[.]” Further, the court stated:
I indicated that if the parties could not agree on an additur, more or less, that the court was inclined *** to grant the motion for a new trial solely as it relates to the question of special damages relating to past and future medicals, not as to general damages, but solely as to those items. But again, I reserve my right to[,] even as to those[,] to reverse myself if I find after I review the case again that that might be warranted!/] I also indicated to counsel *** that I felt that even if counsel agreed to an additur that that would not preclude or bar counsel from taking an appeal as relate[d] to that additur.
⅜⅜‡
Thereafter, the hearing proceeded. After hearing the arguments of counsel, the trial court took the matter under advisement.
On May 29, 2015, the defendants filed a pleading entitled, “Consent Under Protest to Additur with Reservation of Rights to Appeal.” In the pleading, the defendants stated:
[[Image here]]
[T]he Court has indicated that it intends to grant a new trial solely on the limited issues of the jury’s verdict regarding past medical expenses and future medical expenses, or, in the alternative, enter an additur of $20,085.97 with regard to past medical expenses and $13,205.60 with regard to future medical expenses.
⅜⅜⅜
Solely as an alternative to undergoing a new trial on these limited issues, Defendants consent, under protest, to the ad-ditur, reserving all rights on appeal to challenge the propriety of the granting of a new trial, the entry of the additur, or any other disturbance of the jury’s verdict in this matter[.]
On March 22, 2016, the trial court granted the plaintiffs motion for JNOV and increased the jury’s award of damages as follows: past medical care and expenses from $2,500 to $22,585.97, future medical expenses from 11fi$5,500 to $18,705.60, general damages from $35,000 to $45,000, and damages for loss of enjoyment of life from $3,500 to $10,000. In its reasons for judgment, the trial court stated:
[[Image here]]
*422 [Petitioners presented testimony and documentary evidence, including ambulance bills, hospital bills, doctors bills and other expenses. Petitioners also called several doctors[.] All of these health care providers testified as to their contact, diagnosis and treatment of [Da’Veion]. They also identified their respective bills for services rendered and concluded their testimony by indicating that the treatment that they rendered to [Da’Veion] was necessary and related to the accident in this case.
The defendants did not call any witnesses to counter the testimony of petitioners’ above witnesses or evidence. Moreover, the defendants did not allege in their answer to petitioners’ lawsuit that any of the above treatment rendered to [Da’Veion] was in bad faith, unnecessary or amounted to over treatment.
[[Image here]]
The defendants appeal.
DISCUSSION
The defendants contend the trial court erred in granting JNOV and increasing the amount of damages awarded. They argue that the trial court erred in “improperly disturbing the jury’s verdict” and that “[o]bviously, the jury concluded that not all of the treatment Plaintiff was administered or which was recommended in the future was causally related to any injury sustained by Da’Veion[.]” More specifically, the defendants argue that a reasonable jury could have concluded that Da’Veion was not physically injured in the accident and that the accident “did not have a significant psychological effect on him”; therefore, the jury’s award of general damages in the amount of $35,000 was appropriate. The defendants also maintain that the jury could have concluded that the jury’s awai-d of $2,500 for past 117medical expenses was appropriate because Medicaid paid for the cost of Da’Veioris past medical expenses. Further, the defendants argue that a reasonable jury could have concluded that $5,500 for future medical expenses was appropriate.
A party may move for JNOV on the issue of damages. LSA-C.C.P. art. 1811. The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion, which is of such quality and weight that reasonable and fair-minded men, in the exercise of impartial judgment, might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Robinson v. Fontenot, 2002-0704 (La. 2/7/03), 837 So.2d 1280; Davis v. Wal-Mart Stores, Inc., 2000-0445 (La. 11/28/00), 774 So.2d 84, 89; Fanguy v. Patwardhan, 48,773 (La.App. 2 Cir. 4/9/14), 136 So.3d 998.
The standard of review for a JNOV on appeal is a two-part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done *423 by using the aforementioned criteria, just as the trial court does in deciding whether or not to grant the motion. After determining that the trial court correctly applied .its standard of review as to the jury verdict, the appellate court reviews the JNOY using hsthe manifest error standard of review. Robinson, supra; Davis, supra; Caskey v. Merrick Const. Co., 46,886 (La. App. 2 Cir. 3/14/12), 86 So.3d 186, writ denied, 2012-0847 (La. 6/1/12), 90 So.3d 442.
After reviewing the record, we find that the trial court carefully considered the testimony, the medical records submitted into evidence and the medical bills. There is absolutely no evidence in the record to support the defendants’ contention that Da’Veion did not sustain any physical injuries as a result of the áccident. Da’Veion’s medical records from his emergency room visit show that he was “crying” and “denies pain at this time.” However, Da’Veion, his mother and two medical professionals—nurse practitioner Addie Morris and Dr. Holt—testified with regard to the physical injuries Da’Veion sustained as a result of the accident. His medical records, which clearly detail his complaints of pain and the treatment therefor, were admitted into evidence during the trial.
We also find no evidence of record to support the defendants’ contention that the accident did not have a “significant psychological effect” on De’Veion. Da’Veion’s mother, Dr. Agarwal and Dr. Tatem all testified with regard to the mental/emotional injuries he sustained. Additionally, the injuries are well documented in Da’Veion’s medical records. The defendants did not present any medical evidence to contradict the medical testimony and documentary evidence introduced by the plaintiff. Additionally, the defendants did not request an independent medical examination of Da’Veion to show that the treatment he received was not medically necessary. Consequently, we cannot say the trial court erred in its evaluation of the evidence in granting the JNOV on the issue of damages.
hflOnce a trial court has concluded that a JNOV is warranted on the issue of damages, it must then determine the proper amount to be awarded. After rendering the JNOV, the trial court must render a de novo award, based on its independent assessment of injuries and damages. Anderson v. New Orleans Public Serv., Inc., 583 So.2d 829 (La. 1991); Rickerson v. Fireman’s Fund Ins. Co., 543 So.2d 519 (La.App. 1st Cir. 1989). In Anderson, supra, the Court stated:
The trial judge is in a better position to make a damage award than is an appellate court. The trial judge hears the testimony, views the evidence and is able to evaluate the credibility of the witnesses. Once the jury verdict is ket aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a .damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.
Id., at 834.

General Damages—Mental pain and anguish/Physical pain and suffering

There is no mechanical rule for determining general damages. The facts and circumstances of each case control. Guerrero v. Brookshire Grocery Co., 49,-707 (La.App. 2 Cir. 4/29/15), 165 So.3d 1092; Blue v. Donnie Baines Cartemps USA, 38,279 (La.App. 2d Cir. 3/3/04), 868 So.2d 246. The nature, relative severity and bodily extent of injuries are qualitative factors that must first be considered by *424 the trier of fact in awarding general damages. Young v. Marsh, 49,496 (La.App. 2d Cir. 11/19/14), 153 So.3d 1245. The duration of a plaintiffs injury symptoms and the duration of treatment are relevant quantitative factors that must also |2nbe taken into account. Id.) Caldwell v. AN-PAC Ins. Co., 50,333 (La.App. 2d Cir. 1/13/16), 185 So.3d 846.
In the instant case, in assessing general damages, the trial court noted the duration of time for which Da’Veion received medical treatment for his injuries. The evidence showed that Da’Veion was transported to the emergency room via ambulance after being involved in an accident in which the SUV in which he was a passenger “flipped over” several times. The medical records from the emergency room visit reveal that Da’Veion denied being in pain at that time; therefore, he was instructed to follow up with his pediatrician “within 1 to 2 days.” The following day, Da’Veion’s mother took him to his primary care provider, the All Kids R Us clinic. The medical records from that visit reveal that Da’Veion was complaining of muscle “soreness” and pain in the area of his right ribcage the day after the collision. When he returned to the clinic one week later, he continued to complain of pain in the area of his right chest and ribcage. Nurse Practitioner Morris and Dr. Holt both testified, in some detail, about Da’Veion’s injuries and subsequent treatment. Da’Veion returned to the All Kids R Us clinic on several occasions for various complaints associated with the accident at issue. He also received treatment from Dr. Holt for three months following the accident. Dr. Holt testified that in his initial examination, he noted that Da’Veion had muscle spasms throughout his back and his condition improved over time. By October 1, 2013, Da’Veion’s physical complaints had resolved and he had returned to his pre-accident status.[9]
121 Additionally, Da’Veion’s records from his extensive psychiatric and psychological treatment show that he suffered mental anguish as a result of the accident. Dr. Agarwal provided uncontroverted testimony that the accident was the cause of Da’Veion’s depression, PTSD and surviv- or’s guilt.
It is apparent from the trial court’s reasons for judgment that he reviewed Da’Veion’s medical records in great detail. The trial court noted the duration for which Da’Veion experienced symptoms of physical pain and the duration for which he exhibited signs of mental/emotional suffering. At the time of the trial, approximately two years after the accident, Da’Veion was still receiving psychiatric treatment and psychological counseling for symptoms of PTSD, depression and survivor’s guilt.
It is clear from the record that, Da’Veion had recovered from his physical injuries. However, it is clear from the testimony that he suffered a significant emotional trauma. Da’Veion was only 11 years old at the time of the accident and was traumatized from being involved in a rollover collision. Both Da’Veion and his mother testified with regard to the “gruesome” nightmares he experienced after the accident. Da’Veion’s mother provided uncon-troverted testimony with regard to his psychological issues following the accident. *425 She testified that the once outgoing child became emotionally withdrawn and stopped participating in family activities. After reviewing this record in its entirety, we find no error in the trial court award of general damages in the amount of $45,000 and $10,000 for loss of enjoyment of life.

Past Medical Expenses

^Additionally, the defendant’s argument that Da’Veion’s award of damages should be limited because his medical bills were paid by Medicaid lacks merit. A plaintiff may ordinarily recover reasonable medical expenses, past, present and future, which he incurs as a result of injury. Richardson v. Christus Schumpert Health Sys., 47,776 (La.App. 2d Cir. 2/27/13), 110 So.3d 264, writ denied, 2013-0621 (La. 4/19/13), 112 So.3d 228; Terrell v. Nanda, 33,242 (La.App. 2d Cir. 5/10/00), 759 So.2d 1026. Under the “collateral source rule,” a tort-feasor may not benefit because of his victim’s receipt of insurance payments from sources independent of the wrongdoer’s contribution.
The medical bills introduced into evidence reveal that his past medical expenses totaled $22,585.97. As stated above, the defendants did not introduce any evidence to prove that Da’Veion’s medical treatment was unnecessary or unwarranted. Although much of the cost of Da’Veion’s medical treatment was paid by his health insurer, the defendants cannot benefit from such payment under the collateral source rule.[10] Accordingly, we find no error in the trial court’s award of $22,585.97 in damages for past medical expenses.

Future Medical Expenses

The recovery of future medical expenses is dependent upon the tort victim establishing the probability of the future medical expenses with supporting medical testimony and estimations of their probable cost. Menard v. Lafayette Ins. Co., 2009-1869 (La. 3/16/10), 31 So.3d 996; Fuller v. D.L. Peterson Trust Co., 50, 699 (La.App. 2d Cir. 6/22/16), 197 So.3d 244, writ denied, 2016-1658 (La. 1/9/17), 2017 WL 85548. Importantly, future medical expenses must be established with some degree of certainty. Id. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. Id. It is well acknowledged an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. Menard, supra; Keeth v. State, Dept. of Public Safety & Transp., 618 So.2d 1154 (La. 1993); Robbins v. State ex rel. Dept. of Labor, 31,590 (La.App. 2d Cir. 2/24/99), 728 So.2d 991. It follows, therefore, such awards “generally do not involve determining the amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?” Menard, supra, quoting Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 702, 7-4 (2009).
Herein, the record reveals that, at the time of trial, Da’Veion was still receiving psychiatric treatment from Dr. Agar-wal and was being prescribed medications for depression, PTSD and sleeplessness. The record also shows that Da’Veion was still attending counseling sessions with Dr. Tatem. As stated above, Dr. Agarwal opined that Da’Veion would need psychiatric and psychological treatment “for the next four years” or “until his 18th birthday.” She testified at length regarding Da’Veion’s depression and his intermittent *426 exhibition of anger and behavioral issues. Dr. Agarwal provided uncontroverted testimony that Da’Veion needed monthly counseling and medication until he reached the age of 18 “to help him grow up a normal person.” Based on Dr. Agarwal’s recommendation, Dustin Eubanks, the CEO of the Macro Group, testified that the estimated cost of Da’Veion’s | ^future medical care was $18,705.60. Eubanks testified that the estimated costs were based on monthly individual counseling sessions, monthly psychiatric visits and medications.
As stated above, in response to the plaintiffs evidence, the defendants did not introduce any evidence to refute Dr. Agar-wal’s testimony that Da’Veion would require counseling and psychiatric treatment for at least the next four years. Further, it is clear from the record that Da’Veion’s mother sought psychological treatment for her son soon after the accident. The evidence established that she has kept up with all of his appointments and she administers his medication as prescribed by the physicians. Additionally, Da’Veion’s mother has followed the advice of the medical professionals and determined that Da’Veion needed all of the recommended medical services. The record is devoid of any evidence that Da’Veion’s mother has sought treatment for her son that is not medically necessary for his full recovery. Therefore, we cannot say the trial court erred in awarding damages in the amount of $18,705.60 for future medical expenses.
The defendants also contend the trial court erred in awarding damages for Da’Veion’s mental anguish or emotional distress in connection with the death of Lavender. The defendants argue that Da’Veion was not biologically related to Lavender, and LSA-C.C. art. 2315.6 allows only a limited class of persons to be awarded damages for witnessing an injury to another person. Therefore, according to the defendants, Da’Veion “did not have the requisite familial relationship with [Lavender] in order to recover for any emotional distress or mental anguish he suffered from witnessing her death.”
| gf;Our review of this record reveals that in response to the plaintiffs petition for damages, the defendants filed a peremptory exception of “partial no cause of action,” arguing that the plaintiff was not within the class of persons who could assert a claim under LSA-C.C. art. 2315.6 and LeJeune v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990). Thereafter, the parties agreed to a consent order to dismiss any claims pursuant to LeJeune. The order reserved the plaintiffs right to seek damages for Da’Veion’s mental pain and suffering with regard to his own injuries.
One injured through the fault of another is entitled to full indemnification for damages caused thereby. Wainwright v. Fontenot, 2000-0492 (La. 10/17/00), 774 So.2d 70; Swayze v. State Farm Mut. Auto. Ins. Co., 49,079 (La.App. 2d Cir. 10/21/15), 184 So.3d 81. General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. Duncan v. Kansas City S. Ry. Co., 2000-0066 (La. 10/30/00), 773 So.2d 670, cert. dism., 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001); Swayze, supra. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompany an injury. McGee v. A C & S, Inc., 2005-1036 (La. 7/10/06), 933 So.2d 770; Swayze, supra. The elements of physical pain and suffering and associated mental anguish are conceptually related and, to a large extent, overlapping; therefore, *427 they are difficult to precisely distinguish. Caskey, supra; Swayze, supra.
li>RIn the instant case, as stated above, the medical records show that Da’Veion suffered various mental injuries following the accident. He suffered a myriad of symptoms, including nightmares, sleeplessness, anxiety and withdrawal from his normal every day and familial activities. He was diagnosed with and treated for PTSD, depression and survivor’s guilt. Although the defendants correctly point out that the medical records indicate that Da’Veion was dealing with “grief’ associated with the death of his godmother, it is undeniable that this young man suffered a significant emotional trauma as a result of being involved in this automobile collision. This assignment lacks merit.
The defendants also contend the trial court erred in disallowing impeachment evidence of the 1997 retroactive suspension of Dr. Holt’s chiropractic license by the Louisiana State Board of Chiropractic Examiners (“LSBCE”). According to the defendants, the trial court’s ruling contradicts this Court’s decision in Pratt v. Culpepper, 49,627 (La.App. 2d Cir. 2/27/15), 162 So.3d 616.
“Relevant evidence” means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. LSA-C.E.' art: 403. The trial court has great discretion concerning the admission of evidence at trial, and its decision to admit or exclude evidence may not be reversed on appeal in the absence of an'abuse of that discretion. Medine v. Roniger, 2003-3436 (La. 7/2/04), 879 So.2d 706; Won Suk Lee v. Holyfield Const., Inc., 47,204 (La.App. 2d Cir. 6/20/12), 93 So.3d 868. On appeal, the court must consider whether the contested ruling was erroneous and whether the error affected a substantial right of the party. LSA-C.E. art. 103; Won Suk Lee, supra. If not, reversal is not warranted. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. Won Suk Lee, supra; Hays v. Christus Schumpert Northern La., 46,408 (La. App. 2d Cir. 9/21/11), 72 So.3d 955.
In Pratt, supra, the plaintiff and the defendant were involved in a low-impact/“fender-bender” automobile collision. The damage to both vehicles was described as “slight” and the plaintiff denied being injured at the scene. Thereafter, the plaintiff filed a lawsuit, alleging that his vehicle was struck from behind “with tremendous force,” and that he had suffered significant injuries to his back, head and neck. The plaintiff sought chiropractic treatment from Dr. Holt. Prior to the trial, the plaintiff filed a motion in limine, seeking to prohibit the defendants from using any statement or reference to any disciplinary actions taken against Dr. Holt by the Louisiana State Board of Chiropractic Examiners (“LSBCE”). In response, the defendants argued that Dr. Holt’s license had been suspended “for Medicaid billing and fraud and for overtreatment of patients” and that the evidence thereof was relevant to Dr. Holt’s credibility as a witness. The trial court denied the motion in limine and the plaintiff appealed. This Court affirmed the trial court’s ruling, stating:
[T]he trial court carefully considered whether the information concerning the suspension of Dr. Holt’s license would be admissible at trial. The trial court found that it was relevant where the *428 suspension arose from overtreatment of patients l^and an issue in this case was the degree and cost of treatment rendered to the plaintiff. In essence, the information was not offered as to general reputation, but to provide relevant information on the credentials of an expert witness.
[[Image here]]
This case does not present a simple question of whether the trial court’s ruling on the motion in limine on this issue was correct. Surprisingly, after extensively arguing that the evidence was not admissible, Pratt’s counsel presented the evidence to the jury himself. When Pratt’s counsel called Dr. Holt to testify, among the first questions asked was whether Dr. Holt’s chiropractic license had ever been retroactively suspended for any reason.
***
Although prior to trial, Pratt strenuously objected to the admissibility of evidence regarding Dr. Holt’s dispute with the LSBCE, it was the plaintiff himself who presented the information to the jury. Perhaps this was a strategy decision on the part of Pratt’s counsel to attenuate the impact of the information. However, in choosing to place the information before the jury, Pratt opened the door regarding the issue and waived any objection he had to its admission. Having done so, he cannot now, on appeal, object to its admission. Further, because Pratt introduced testimony and evidence regarding the LSBCE proceedings, the defendants were entitled to cross-examine him regarding the issue. In any event, the trial court did not err in its ruling that the evidence would be admissible due to its relevance to the matters in this case.
Id., at 622-23 (internal citation omitted).
In the instant case, counsel for the defendants conceded that the plaintiff in Pratt was involved a low-impact collision. Nevertheless, counsel attempted to compare the facts of this case to those in Pratt by arguing that Da’Veion did not have any physical injuries whatsoever. Counsel further maintained that Da’Veion did not begin to complain of pain until he presented to Dr. Holt, five days after the accident. In response to counsel’s argument, the trial court noted the following facts: Addie Morris, the nurse practitioner, had testified that Da’Veion presented to the All Kids R Us laadinie the day after the accident complaining of pain and discomfort; defense counsel did not “aggressively pursue any line of questioning that would tend to discredit” Morris’ testimony; and the medical records belied counsel’s contention that Da’Veion did not complain of pain until five days after the accident. In response, counsel staunchly refuted Da’Veion’s complaints of pain, asserting that the medical records indicated that Da’Veion did not have any bruises or abrasions; therefore, his complaints were “subjective,” rather than “objective.”
In response, plaintiffs counsel argued that the collision in Pratt was a low-impact collision, resulting in minimal damage to both vehicles. Plaintiffs counsel also noted that the impact herein occurred between two vehicles that were traveling approximately 50 miles per hour, and the vehicle in which Da’Veion was riding rolled over multiple times.
After hearing arguments from counsel, the trial judge adjourned to chambers to review this Court’s decision in Pratt. After reconvening, the trial judge sustained the plaintiffs objection to defense counsel’s line of questioning, stating:
I’ve looked at this Pratt case and I’ve read what the court had to say ,.. about the relevancy and the admissibility of the administrative proceedings that *429 ultimately led to the retroactive suspension of Dr. Holt’s chiropractic license before the Chiropractic Board back in 1997. *** [E]aeh ease, when the court is called upon to make rulingfe] on issues like this, must be governed by their own facts and that ruling [is] often times fact driven. *** I have read the Pratt case, I’ve looked at the facts in Pratt and I don’t find that Pratt on its facts are factually analogous to this case.
[[Image here]]
I think Pratt is limited to its own facts and to Pratt alone. I don’t think that one can extrapolate from Pratt and extend Pratt to cover any circumstances |snthat the court did not have before it. And I can’t factually compare Pratt to the facts of this case.
⅜⅜⅜
I don’t know if you’re contending excessive treatment or what but there’s no affirmative defense in your answer that speaks to whether or not Dr.—Dr. Holt’s treatment was necessary or unnecessary[.] *** Just like [the plaintiff] got to plead in his petition what he’s claiming as damages, injury and loss that he has sustained, you’ve got to likewise put him at least on fair notice as to what you’re trying [to] offer as a defense. Just denying something and then saying later on, I want to use this evidence to attack credibility *** I think that if you’re going to assert something as an affirmative defense you need to allege it in your ... answer in response to the petition. And that has not been done here[.]
***
[E]ven if this evidence regarding the alleged impeachment of the doctor concerning what happened in 1997 ... is relevant, I find that the probative value of the evidence is outweighed by its prejudicial effect under [LSA-C.E. art.] 404 and therefore the Court sustains the plaintiffs objection to that line of questioning.
[[Image here]]
[T]he defense has certainly has not claimed it its—in its pleadings that Dr. Holt either by way of its original answer or any supplemental amending answers to its original answer, that Dr. Holt was guilty of any improper or nefarious conduct in connection with this case. Nor has the defense alleged ... fraud or overtreatment or overbilling or any illegality with respect to Dr. Holt in connection with this case.
***
After reviewing this record, we find that the trial court had broad discretion in making the evidentiary ruling regarding the 1997 retroactive suspension of Dr. Holt’s license. The court was within its discretion in sustaining the plaintiffs objection and there is no evidence, or argument by the defendants, that a substantial right was affected. This assignment lacks merit.
| „ CONCLUSION
For the reasons set forth herein, we affirm the trial court’s grant of the plaintiffs motion for JNOV and the trial court’s award of damages. Costs of this appeal are assessed to the defendants.
AFFIRMED.

. The injuries sustained by Lavender and DaShawn are not at issue in this case, unless related to Da’Veion’s injuries.

. Zachary Simmons was the record owner of the vehicle.

. By the time the trial was held, Shaune Maynard, the state trooper who investigated the accident, had transferred to south Louisiana. Sergeant John Clary testified from the accident report Maynard had prepared, Sgt. Clary stated that the accident report stated "no injury” as it related to Da’Veion. However, he testified that he did not know whether Maynard had spoken to Da'Veion at the scene. Sgt. Clary stated that he "assumed” that Maynard had “talked to everybody,”

. DaShawn was admitted into the hospital.

. Morris documented that Da’Veion came to the clinic that day at the request of an attorney. However, Da’Veion’s mother indicated that she took Da'Veion back to the clinic because she did not know what else to do because he "wasn’t himself.”

. It remains unclear, from this record, exactly what the Macro Group is or does, other than provide counseling services and psychiatric treatment to individuals. During the trial and in the brief to this Court, counsel for the defendants takes issue with the Macro Group. However, his statements are not confirmed by the record in this case.

. Dr. Agarwal described "zoned out” as "not paying attention, he’s kind of quiet, very slow.”

. The plaintiff requested additur as follows:

. During the trial and in their brief to this Court, the defendants suggest that Da'Veion was not injured in the accident because he was a member of the football team at his school during the fall of 2013, while he was being treated by Dr. Holt. However, other than pointing out that Da’Veion was a member of the football team, the defendants did not solicit any information as to Da’Veion’s specific involvement with the team, i.e., whether he actively participated during practice and/or football games.

. We note that plaintiffs counsel correctly argues that Medicaid must be reimbursed for the payments it made for Da’Veion’s medical treatment.