Judgment rendered April 20, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,158-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CD, INDIVIDUALLY AND ON                      Plaintiffs-Appellees
BEHALF OF THE MINOR, SD

versus

SC, INDIVIDUALLY AND AS THE                  Defendants-Appellants
PARENT AND GUARDIAN OF DJ,
ROCK SOLID CAMPS, LLC, AND
STATE OF LOUISIANA,
DEPARTMENT OF HEALTH AND
HOSPITALS, IN SOLIDO

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 551260

Honorable Craig Owen Marcotte, Judge

* * * * *

JEFF LANDRY                                   Counsel for Appellant,
Attorney General                             State of Louisiana,
By: Ronald F. Lattier                        Department of Health
    Special Assistant Attorney General       and Hospitals

MARK A. PERKINS                              Counsel for Appellant,
                                             Rock Solid Camps, LLC

SONIA COLEMAN                                Appellant, In Proper Person,
                                             Mother and Guardian of
                                             Her Minor Child, DJ

MORRIS & DEWETT, LLC
By: J. Chancellor Nerren
    Brandon Trey Morris
    Justin C. Dewett

LAW OFFICE OF KYLE M. ROBINSON
By: Kyle M. Robinson

Counsel for Appellees,
CD, Individually and on
Behalf of the Minor, SD

\* \* \* \* \*

Before MOORE, PITMAN, STONE, STEPHENS, and ROBINSON, JJ.

PITMAN, J., dissents with written reasons.

STONE, J., dissents for reasons assigned by J. Pitman.

**STEPHENS, J.**

The instant appeal was filed by the State of Louisiana, Department of Health and Hospitals, from an adverse judgment, entered in accordance with the verdict of a 12-person jury, which found the State responsible for the majority of the fault and damages sustained by a young boy who was sexually assaulted by an older boy at a day camp. For the reasons set forth below, we amend the judgment of the trial court in part, and, as amended, affirm.

## FACTS/PROCEDURAL BACKGROUND

This case arises out of an incident that occurred at the Rock Solid Camp held at Calvary Baptist Church on Linwood Avenue in Shreveport, Louisiana, on July 26, 2010. Rock Solid is a summer day camp/sports camp where children of varying ages could swim, engage in sports activities, and take field trips, among other things. On that day, 14-year-old DJ sexually assaulted 8-year-old SD in a shower stall in the men's restroom while both were participants in the camp program.

CD, father of the minor SD, filed a petition for damages individually and on behalf of his son, naming as defendants: (1) SC, the mother of the minor DJ; (2) Rock Solid Camps, LLC; and (3) the State of Louisiana, Department of Health and Hospitals ("State" or "DHH"). Plaintiff's claims against the State were that SC was employed by the Office of Behavioral Health ("OBH") and/or the Shreveport Mental Health Clinic, both under the umbrella of the DHH, and that SC and/or OBH referred the minor DJ to Rock Solid but failed to warn the camp of DJ's history of predatory sexual behavior involving young children.

Rock Solid answered the petition and filed a cross-claim against DHH, asserting that the State of Louisiana referred DJ to Rock Solid and intentionally "allowed a menace to be enrolled in their facility without notification." DHH expressly denied the claims of plaintiff's petition and Rock Solid's cross-claim and alleged that SC was acting in her capacity as DJ's mother when she enrolled DJ in Rock Solid, not in the course and scope of her employment with DHH. Furthermore, DHH did not refer DJ to Rock Solid, since DJ was neither a client of nor receiving services from the Shreveport Mental Health Clinic, a prerequisite for any referrals by DHH. Therefore DHH had no duty to disclose any information regarding DJ's juvenile history.

Trial was held February 24-27, 2020. At the close of plaintiff's case, DHH filed a motion for directed verdict which was denied by the trial court. Following closing arguments, the case was submitted to the jury which rendered a verdict against defendants and awarded general damages to plaintiff in the amount of $1.25 million. The jury found liability on the part of all three defendants and apportioned fault as follows: 65% to the State of Louisiana, DHH; 30% to Rock Solid; and, 5% to SC. The jury denied Rock Solid's cross-claim, finding that DHH was not liable for any damages to its co-defendant. The trial court rendered judgment in accordance with the jury's verdict against: the State of Louisiana, DHH, in the amount of $812,500, subject to the statutory cap of $500,000, as set forth in La. R.S. 13:5106, together with judicial interest as set forth in La. R.S. 13:5112; Rock Solid Camps, LLC, in the amount of $375,000; and, SC, individually and as the parent and guardian of DJ, in the amount of $62,500, with the

2

latter two awards subject to judicial interest from the date of judicial demand.

DHH filed a motion for new trial and/or remittitur, arguing that the damage award was excessive in light of plaintiff's failure to present any medical evidence to support the award, especially considering intervening events such as the minor SD's congenital disease and a second unrelated sexual assault perpetrated upon the minor SD by a stepbrother. The motion was denied, and DHH filed the instant appeal. Neither Rock Solid nor SC filed either an answer to the appeal or an appellate brief.

## DISCUSSION

### Trial Testimony[1]

Sergeant Jeffrey Allday was the Shreveport Police Department sex crimes investigator sent to investigate a report of an incident that occurred on July 26, 2010, at Calvary Baptist Church in Shreveport, Louisiana, which is where Rock Solid operated its day camp. Sgt. Allday spoke with Officer White, the responding officer, who related that SD, the eight-year-old victim, had been in a shower stall with the 14-year-old suspect when one of the camp counselors, Jared Green, discovered both boys pulling up their pants.

The victim, SD, was examined by a SANE (Sexual Assault Nurse Examiner) at a hospital, but no injuries were noted, and no evidence was collected. SD was interviewed at Gingerbread House two days after the incident. DJ was taken to the police station, but chose not to make a

---

[1] Because neither SC nor Rock Solid has appealed or filed an appellate brief, testimony and/or discussion of issues not pertinent to the instant appeal, such as their fault and Rock Solid's counter-claim against the State, is omitted.

3

statement.  Sgt. Allday arrested DJ based upon what the counselor witnessed and the statement made by SD.[2]  Thereafter, DJ was adjudicated delinquent in connection with this incident and a separate one that had occurred in March 2010 at a mental health treatment facility in Shreveport.

When asked on cross-examination whether he revealed to Rock Solid director Shelley McMillian that DJ had been adjudicated delinquent as a sexual predator, Sgt. Allday testified that he could not specifically recall, although he did admit that he might have asked her whether she knew of any previous such incidents involving DJ.

Todd Carlisle testified that he is a probation and parole officer with the State of Louisiana's Office of Juvenile Justice ("OJJ").  Beginning on November 10, 2009, DJ came under his supervision for probation as an interstate compact transfer from Texas when his family moved to Louisiana to be closer to family.  Carlisle explained that the interstate compact is an agreement between participating states which provides that youths who transfer from one jurisdiction to another will be supervised as if they were still under the control and supervision of the jurisdiction in which they committed the offense for which they are being monitored.

In the previous case, DJ committed aggravated sexual assault of a child under the age of 14 in Texas which, as explained by Carlisle, is comparable to aggravated rape in Louisiana.  DJ received probation in Texas.  As a participating state, Louisiana was to provide the supervision as ordered by the Texas court, which included, among other things, finding

---

[2] Discussion of details of the incident, *inter alia*, is omitted from this opinion due to the ages of the victim and perpetrator at the time.

4

sexual perpetrator counseling for DJ and having DJ abide by a 7:00 p.m. curfew.

Carlisle testified that an interagency services coordination ("ISC") meeting was held on December 9, 2009. Among those in attendance were DJ and his mother, SC; Carlisle and Vernon Williams from OJJ; and, Kim Williams, who was the ISC coordinator.

At the meeting, SC expressed her concern about DJ's grades and the fact that he was having fights at school. According to Carlisle, they also discussed the sexual abuse counseling that DJ was required to have. He assumed that Ms. Williams knew that DJ was on probation for sexual abuse, since she helped coordinate some of his treatment.

Carlisle stated he was informed of the sexual assault allegedly committed in March 2010 by DJ at the Northwest Regional Mental Health Center, which is where DJ had been going for additional counseling. Carlisle noted that DJ was adjudicated as delinquent in connection with this incident as well as the one that occurred in July 2010 at Rock Solid on October 12, 2010, the petition for adjudication for both offenses having been filed two days after the incident at Rock Solid.

Carlisle testified that he was unaware that DJ had attended Rock Solid camp until after the fact. To his knowledge, no one at OJJ knew that DJ was going to Rock Solid. As DJ's probation officer, he would like to have known that information beforehand, so he could have brought it to the Texas court's attention. DJ was a red level offender; he had one adjudication and one allegation of sexual assault of a child, and Carlisle stated that he would have never approved for DJ to attend a camp like Rock Solid

One of the treatment recommendations from Dr. Greg Brown, who first evaluated DJ in 2009, was that DJ needed to be watched closely for inappropriate sexual behavior and should not be left unattended or alone with younger children at any time without direct adult supervision. In February 2010, Dr. Brown recommended that DJ be continuously watched on a constant basis and not be left unattended with any children at any time.

Carlisle testified that he could not have disclosed anything to Rock Solid even had he known about the camp. Carlisle stressed during cross-examination that he has to comply with the confidentiality rules applicable to his field. Absent a court order or signed release, he is bound by law not to release DJ's information. He noted that Ms. Williams with the OBH is subject to the same rules.

Kim Williams testified that she worked for the Office of Mental Health, an arm of DHH, in the Shreveport regional office in 2010. Her job primarily entailed working with children with mental health issues and coordinating treatment and support services. She also approved or denied funding for them for some support services or participation in certain activities. Ms. Williams stated that she coordinated services for DJ and briefly discussed the December 9, 2009, ISC meeting.

Ms. Williams stated that she approved the financial assistance that allowed DJ to go to Rock Solid, but didn't remember whether his mother SC worked for her at the time that she made this decision. Ms. Williams admitted that she knew that DJ was on probation for a sexual incident involving a minor and accused of a second molestation incident involving a minor prior to approving his funding for Rock Solid camp. According to Ms. Williams, the only thing she discussed with Rock Solid personnel about

6

DJ was funding. Ms. Williams related that she is bound by law protecting confidential information regarding DJ's treatment, probation status, and criminal history.

Ms. Williams testified that she did not call the OJJ and let them know that DJ wanted to go to camp. She also did not call DJ's doctor to ask him whether DJ should go to camp, despite knowing that he would be in proximity to children on a daily basis. Ms. Williams stated that she did not ask SC whether she told Rock Solid about DJ's history. Ms. Williams acknowledged that she could have communicated with either DJ's probation officer or mother about the wisdom of DJ's attending Rock Solid but did not do so. Likewise, she could have denied funding and at any point in time made the decision not to send DJ to camp.

On cross-examination, Ms. Williams testified that she had helped fund or pay for other children to attend Rock Solid, and she was familiar with the programs they provided. She acknowledged that Vern Williams from OJJ was supposed to be the person looking for a program for DJ. Ms. Williams testified that when SC came to her with her desire to send DJ to Rock Solid, she never informed or spoke to Mr. Williams at OJJ about Rock Solid, or asked whether DJ going to camp would be a good idea. SC asked her about funding to send DJ to Rock Solid because SC couldn't pay for it otherwise. Ms. Williams assumed that, without the funding, DJ would not have been at Rock Solid.

Ms. Williams testified that Rock Solid had never provided her with any type of release or request for information about the backgrounds of any of the children she had previously funded, including their medical issues or criminal histories. She noted that in her prior dealings with Rock Solid, she

had funded children with behavior problems at school and some on probation. She just sent payment; she reiterated that she could not have sent any additional information about the children, including DJ, without a legal release or court order.

Next to testify was Jennifer Martinez, administrative assistant and after-school program director at Rock Solid at the time of the incident. Ms. Martinez stated that at Rock Solid, campers were divided based on gender, age, and the camp program in which they participated. Kids were kept within their age groups unless there was a specific reason for a change.

Ms. Martinez found out about the incident when the counselor brought both DJ and SD to the office. The counselor told her that he found the two boys in the bathroom pulling up their pants. She telephoned her contact at Shreveport Mental Health, Ms. Williams, who told her to call the police. Ms. Martinez phoned the boys' parents after she called the police. Ms. Martinez testified that at the time of the incident, she was unaware of DJ's history. Rebutting Ms. Williams' testimony that she never spoke to anyone at Rock Solid about DJ, Ms. Martinez stated, "that would be severely incorrect," and noted that Ms. Williams told her that DJ needed help socializing. SD, who was eight years old at the time of the incident, had been moved up to the older group that also contained DJ because SD had been fighting at camp and his dad had asked that he be moved up to that group.

Ms. Martinez testified that the camp director, Shelley McMillian, had no idea about DJ's history prior to the incident. As for how 8-year-old SD ended up in the same group as the 14-year-old DJ, Ms. Martinez explained that at first, SD and his twin brother AD were together in the 7- to 8-year-old

8

group, and their 10-year-old brother BB was in the 9- to 10-year-old group. When SD had to be moved, it was because he had been fighting. His father CD asked that he not be moved into his older brother's group, but to the next oldest group, which was the 11- to 14-year-old group. While CD made the decision to have SD move up to the older group, the move was approved by Rock Solid. Ms. Martinez testified that both DJ and SD had previous incidents of fighting at camp. When asked whether a higher level of supervision was provided for these boys, both of whom had been in trouble for fighting, Ms. Martinez's answer was, "They were being boys, … No." Ms. Martinez identified exhibit 14 as the 2010 sign in/out sheet for camp, and noted that SD and his brothers returned to camp two days after the incident, finished out that summer, and came back for camp in 2011.

Shelley McMillian testified that she is the executive director of the Rock Solid program. Prior to the summer of 2010, Ms. McMillian stated that Rock Solid had accepted referrals from Shreveport Mental Health for maybe two to three years. They would ask Kim Williams "without question" why a referred child was under her care to determine whether there was something that might be an issue for Rock Solid. While Ms. Williams did not disclose "specifically" why a certain child was under her care, she would relate information such as any dangers or behaviors they should be aware of, and whether there were any special needs or disabilities.

Regarding the circumstances of DJ's enrollment at camp, Ms. McMillian testified that his mother said as a single mother and new to the area, looking for a job, she couldn't pay for both of her kids to go to Rock Solid. SC asked for a subsidy for her daughter, but told them that Shreveport Mental Health might pay for her oldest, DJ. She would know

9

later after she and DJ worked out his summer schedule: he was going to summer school and they had to work around that. Ms. McMillian asked SC why DJ was at Shreveport Mental Health, and SC told her that he was dealing with some depression and needed some social interaction. Ms. McMillian testified that had she known of DJ's history (two prior sexual assaults), she would not have allowed him to come to Rock Solid.

SD had gotten two strikes for hitting and punching kids and using terrible language. On the third strike, Ms. McMillian called CD and told him the other two boys could stay at Rock Solid, but SD was at strike three and couldn't remain at camp. CD asked her if SD could stay because he had no other means of child care, but be moved up to the 11- to 14-year-old group. CD didn't want SD in either group that his other brothers were in because of the potential for conflict with them. Ms. McMillian testified that she broke her own policy to let SD stay at Rock Solid.

CD testified that he is the father of SD, who is now 17 years old. SD has a twin brother, AD, and an older brother, BD. CD has had custody of the boys since the twins were 10 months old; their mother left them then, and they have had no contact with her since then. Both twins were born with a congenital condition known as Cornelia de Lange syndrome. CD stated that his sons have a mild case of it—they both have a learning disability which makes it difficult for them to learn and determine, in some situations, what is good or right. According to CD, the boys have always struggled with this.

After the incident at Rock Solid, he took SD to the Gingerbread House for counseling with Bonnie Howell. SD had an appointment every other week or once a month for five years depending on CD's schedule and

10

the counselor's, before transitioning to counseling elsewhere. According to CD, the program helped his son a lot, although he does not know what went on in the sessions. Because Ms. Howell told him to respect SD's privacy and let him talk about things voluntarily, that is what he did.

CD stated that, prior to the incident, SD and his twin brother were rambunctious. Because of their learning disability, they are both in special education. The school provides a classroom in which they can do homework and have extra time to take tests. AD's grades range from A to D on his report card; SD's range from a low B to F. CD testified that after the incident, SD struggled with anger more. At school, he lashed out if he didn't get his way—he would yell, scream, and throw things. SD would tell teachers he wasn't going to do something. According to CD, these behaviors continue today; SD still gets in trouble at school and at home for his actions. Punishments at home include keeping SD inside, taking away his electronic gadgets, and not allowing him to go to karate, something SD loves. CD stated that SD began karate four years ago because his counselor suggested that he begin an extracurricular activity that could help him with his anger issues.

SD now goes to see a counselor at child psychologist Bruce McCormick's office. According to CD, SD has behavioral issues and trauma because his mother left. CD admitted that it is hard to relate all of the counseling to the Rock Solid incident, but SD has never been the same since that day. CD testified that he got married in 2010 to someone he met at church. A year after the incident at camp, when SD was 9 or 10 years old, and his stepbrother was 12 or 13 years old, CD came home from work and his wife was crying. The two boys were in separate rooms, and his wife told

11

him that she had caught her son, SD's stepbrother, asking SD if he could touch SD and do inappropriate things to him. From what CD understood, SD responded correctly and told his stepbrother no. CD called the police, and the wife and stepbrother left the house. According to CD, after that incident, SD "was pretty much the same."

CD testified that he sent his boys back to Rock Solid after the incident in July 2010 because to him, the threat was gone. "[T]he perpetrator was in jail, in custody. And I still didn't have anywhere else to take the kids either." Additionally, the boys wanted to go back to camp.

On cross-examination, CD stated that he always prefers that SD and his twin brother be in different groups because they feed off of each other. They were placed in separate 7- to 8-year-old groups at Rock Solid because that is what he requested.

CD testified that he could not recall whether he listed in SD's camp application that he had a learning disability. CD stated that SD had behavioral issues prior to the incident at camp, and his problems at camp prior to the one that prompted CD's request to Ms. McMillian to move SD actually required CD to take time off work for several days to stay home with SD, although the other two boys could go to camp during that time. He acknowledged that he did ask Ms. McMillian not to kick SD out of camp, and that it was his decision to move his son to the 11- to 14-year-old group because any of the other options would have involved SD being in a group with one of his brothers.

CD noted that SD liked being in the older group because he could taunt his brothers about it. After the incident, SD wanted to go back to camp. He didn't express fear, wasn't crying or scared. CD was unaware

12

that the stepbrother was adjudicated delinquent for the incident involving him and SD. CD acknowledged that up until that incident, SD had been doing better.

CD testified that, other than the counseling SD got with Dr. McCormick's office and at the Gingerbread House, he has not received any other medical treatment or counseling.

On redirect, CD stated that SD's whole demeanor and attitude are different. SD is angrier and negative. CD testified that there is a lot of bottled-up anger inside his son. SD takes prescription medication and participates in karate, both of which help.

Dr. Bruce McCormick testified that he and therapist Mark Nettles have been treating SD since November 2015. Dr. McCormick stated that when he first met SD in 2015, he was socially awkward and vulnerable to being picked on at school. Because of his cognitive intellectual limitations, SD was likely to misunderstand situations and be unable to distinguish truth from fiction and good intentions as opposed to bad intentions on the part of others involved. According to Dr. McCormick, these behaviors could be possibly, but not necessarily, effects of molestation.

While molestation can cause lasting effects on its victims, Dr. McCormick stated that the effects of molestation are wide and varied, but they can include social distrust, difficulty functioning with other children and in school, an unusual level of fear, behavior problems (because this is a way in which children display anger and sometimes anxiety), and vulnerability for mental health disorders as an adult.

Dr. McCormick opined that SD's neurological disability was a large factor in the difficulties that he has had. SD started out with some

challenges, because he was born with Cornelia de Lange syndrome. The only thing that Dr. McCormick would definitively say was that SD was still struggling with some mental problems as of the date of trial; however, Dr. McCormick would not assign a causal connection between them and the Rock Solid incident, much less any other specific cause. When asked whether all of the symptoms that SD was continuing to manifest were common symptoms following a molestation, Dr. McCormick responded, "I would not say all. I think some of those difficulties result from other challenges. But yes, many of these difficulties could be worsened by … bad life experiences including molestation."

On cross-examination, Dr. McCormick reiterated that he could not specifically say that the incident at Rock Solid in 2010 caused SD's problems independent of or in addition to anything else, or the degree to which the molestation specifically affected SD. Likewise, Dr. McCormick couldn't say what effect the incident involving SD's stepbrother had on SD. Dr. McCormick opined that SD's father's remarriage and living in a different home also could have affected SD.

Dr. McCormick noted that in 2016, he prescribed medication to help SD with self-control and sustained attention, and as of February 3, 2020, the last date that he had seen SD, he appeared to be doing well.

Next to testify was Bonnie Howell, a licensed professional counselor with Gingerbread House. Ms. Howell testified that she began treating SD soon after the molestation incident in 2010 and their sessions ended in November 2015. In the beginning, she used play therapy with SD which helped him work through his anger, regain power, and feel in control.

14

Ms. Howell stated that the molestation was very traumatic to SD. Ms. Howell noted that SD was nervous, upset, anxious, and had a hard time being still. The second incident, the one involving SD's stepbrother, happened shortly after she had begun treating SD. She was proud of SD for standing up to his stepbrother, because it showed her that he had learned to deal with things better. As SD was relating the incident to her, he told her that it made him think about DJ. Ms. Howell testified that the second incident retraumatized SD; the incident brought up memories and reopened all of the wounds they had been working together to heal.

In treatment, they dealt with the Cornelia de Lange syndrome, the Rock Solid incident, and the incident involving SD's stepbrother. Ms. Howell testified that she would definitely say that the Rock Solid incident left a mark on SD. According to Ms. Howell, SD will be able to get better, but he will never forget what happened to him. It is not surprising to her that SD still has issues and needs therapy, based on his disabilities. Ms. Howell stated that, because of SD's predisposition and what he has been through, she is not surprised that the incident that happened at Rock Solid still bothers him today; it will continue to do so.

On cross-examination, Ms. Howell testified that she had no information about any of SD's behavioral issues prior to the Rock Solid incident. She learned during her treatment of SD that he enjoyed camp and in fact returned to Rock Solid. Ms. Howell admitted that she had only treated SD four times before the incident with his stepbrother, and her treatment of him involved the same issues stemming from both incidents.

Ms. Howell noted that in a report from 2012, CD's concerns about SD were the two molestations, school problems, and divorce. She stated that

SD's school problems could have been related to the molestation, but CD's divorce was something that also affected SD. The last time she saw SD, on November 16, 2015, her notes indicate that he was beginning to change his thinking about what had happened and realize that he was okay; he was learning to accept himself in spite of what he went through; and it was okay when he could not do certain things. Ms. Howell noted at that time CD's concerns were that SD was still stealing, lying, and getting in a lot of trouble at school that year.

SC, DJ's mother, testified next. SC stated that she, DJ, and her daughter moved to Shreveport in 2009 after DJ's conviction in Texas for aggravated rape.[3] She began working for the Office of Behavioral Health with the State of Louisiana in March 2010 and worked there for about two years. She then went to work in another capacity for the State with Evergreen Life Services and Behavior Services. SC testified that she got her job with the State when she reached out to OBH during her search for a counseling agency to work with DJ. SC noted she had to find counseling for DJ, who had both been a victim of and a perpetrator of sexual abuse. She and DJ met Kim Williams from OBH in December 2009 at the ISC meeting; she also met probation officer Todd Carlisle and family advocate Gloria Davis at that meeting. At the meeting, there was discussion about DJ's need for both types of counseling, as well as DJ's conviction in Texas, in formulating DJ's plan.

SC testified that she learned about Rock Solid from brochures in the OBH office. Ms. Williams suggested that they contact the owner to see if

_____

[3] DJ was convicted in Texas of aggravated sexual assault of a child under the age of 14.

16

Rock Solid would be a good fit for DJ. Ms. Davis, who also works with OBH, told her that her job might actually pay for DJ to go to camp, so SC talked to Ms. Williams about funds. SC then applied for DJ and his sister to attend Rock Solid camp. She was already working at OBH when she filled out the application form. According to SC, the incident happened the tenth week of camp. Until then, DJ had been happy at camp and had no major issues. SC stated that she could not have afforded camp for both kids had the State not paid for DJ.

On cross-examination, SC testified she knew that, as a condition of DJ's probation, any after-school programs had to be approved by OJJ/Todd Carlisle. SC stated that she did not talk to Carlisle about DJ going to Rock Solid because it was a summer program.[4] SC stated that she told Carlisle that her kids were going to Rock Solid "about the second month of camp"; when asked whether the probation officer objected to DJ being at camp, SC's answer was, "He didn't tell me to take him out. No." Counsel asked again whether SC told Carlisle that DJ was at a summer youth camp with other children, and she responded, "I didn't say it in those words, but I did tell him."

SC admitted that she was aware of psychiatrist Greg Brown's treatment plan for DJ, which included that DJ be watched closely for inappropriate sexual behavior and not be left unattended or alone with younger children at any time without direct adult supervision. This information is in the OJJ records. Ms. Williams has access to these records,

---

[4] However, SC testified that DJ went to summer school for the first part of the summer, and only went to camp full days after summer school was over.

17

SC stated, but Rock Solid does not. SC stated that she did not sign a release to give Rock Solid any information about DJ.

SC stated that she didn't know whether Ms. Williams was aware of the molestation incident that occurred at a mental health facility (not one associated with OBH) in March 2010. After that incident, she took DJ out of his mental health treatment at the facility because he was not being supervised, but had been left alone with another youth there. According to SC, DJ didn't molest the other child, "[t]hey were just caught in a restroom playing around together….That's what the staff told me. That's what the other mother told me."

SC testified that when she first learned of the July 2010 incident, she didn't believe it had happened. DJ told her that the other boy had initiated it, which was "somewhat" like the story he told her about the incident in Texas. SC stated that she warned Rock Solid that DJ had a tendency to antagonize and provoke other children. She also told them that DJ would intentionally place himself in risky situations he knows he shouldn't be in, although "not in those words."

SC stated that Ms. Williams, her boss at OBH, was responsible for coordinating the various agencies, including OJJ, who provided services for DJ. As such, she was very familiar with his background, and knew he was on probation from Texas for aggravated rape. SC repeated that, sometime in March 2010, before she filled out the application for her children to go to Rock Solid, she went to work for OBH, with Ms. Williams as her direct supervisor. SC reiterated that she told Todd Carlisle about DJ going to Rock Solid and either Ms. McMillian or Ms. Martinez at Rock Solid about DJ's

18

adjudication as a sexual predator and the specific restrictions required by his situation.

When questioned on cross-examination by DHH's attorney, SC testified that she contacted Rock Solid on her own first, then went to her supervisor at OBH, Ms. Williams, to talk about the camp. Regarding her initial conversation with Ms. McMillian, SC stated that she related to the camp director that she was looking for a place for both of her children, but was more concerned about DJ. SC told Ms. McMillian that she was very concerned about her son being around younger children, and she filled out an application at Rock Solid that day. Ms. Williams helped her fill out the financial side of the application. When shown the form, SC clarified that she filled out the form herself in April, just days before starting her job at OBH. She also stated that all OBH did was "pay the money."

When asked what she told Ms. McMillian in conversation about DJ, SC said that she told the camp director that she had been having trouble with DJ, he was on probation for sexual abuse, and he needed to stay away from kids under the age of 13. SC testified that Ms. McMillian's response was that they had already been working with children with behavior problems, she had a highly trained staff, and DJ would be in a specific age bracket so he wouldn't be able to "get to" children under the age of 13. Ms. McMillian told SC that they would be okay with DJ being there.

According to SC, she was not aware prior to the incident in July 2010 that there was an 8-year-old in DJ's group; Ms. McMillian didn't keep the promise she made at the time SC enrolled DJ in Rock Solid. SC stated that she was surprised that Rock Solid let an 8-year-old in with 14-year-olds. She knew her son had problems; she was trying to get him into a safe

environment for himself and other kids. SC says she would have removed DJ from Rock Solid had she known. She had no control over the placement of kids at Rock Solid—Ms. McMillian did.

Upon further questioning, SC admitted that she took DJ to Rock Solid in her capacity as his mother, not in connection with her job. When she realized there was money available through a fund that would pay for DJ's camp, that's how she paid for his summer camp. SC was never asked to provide mental health records or sign any disclosure form for camp.

On redirect, SC testified that she started working for the State in March 2010 and applied to Rock Solid camp in April 2010, which is when she asked Ms. Williams to help her with DJ's camp tuition. Without Ms. Williams' help, her kids could not have gone to camp. SC related that her son DJ was sexually abused as a child and now had become a sexual abuser himself. She did not know he would be in a group with an 8-year-old at camp. SC testified that she is sorry for what happened to SD and would like to see him "taken care of."

Testifying on direct exam, Shelley McMillian stated that she has personal empathy with SD because of what he went through; she was a victim of childhood sexual abuse herself. Her biological father abused her from the time she was five years old until she was 13. Because of her experience, she was careful at Rock Solid. She hired the "best of the best" counselors and advertised a 6-to-1 counselor-to-camper ratio; in reality, the situation was closer to a 4-to-1, to ensure the safety of the kids.

Ms. McMillian stated that she heard SC's testimony, and "no, no, no, no," she was not aware that DJ had been adjudicated delinquent as a sexual predator before he came to Rock Solid. What SC and Ms. McMillian

discussed was that DJ was depressed and needed social interaction. Ms. McMillian testified that she did not have any reason to think they needed a release for specific information about DJ because they had a few other campers referred by Shreveport Mental Health with no problems.

When asked whether SC's testimony that she told Ms. McMillian that DJ could not be with any child under the age of 13 was true, Ms. McMillian responded, "No. … Our camp is primarily [kids] five to 13 years old … everyone minus, you know, probably six, seven, eight campers are under the age of 13." Ms. McMillian testified that since Rock Solid began in 2004, close to 15,000 children have come through the camp. Other than this one instance in July 2010, there has not been another situation in which there was any type of sexual impropriety going on at the camp.

**Jury's Factual Findings of Fault/Liability on the Part of the State**

According to DHH, the jury erred in finding that the State had a duty to disclose information about the minor DJ prior to or at the time of his enrollment in camp when no one acting on behalf of the State referred DJ for enrollment in or submitted an application on behalf of DJ to the Rock Solid camp program, particularly considering applicable laws that prohibit state employees from disclosing any information pertaining to a minor's juvenile record or related juvenile proceedings.

On the other hand, plaintiff contends that the evidence supports the jury's imposition of liability upon the State. Ms. Williams, as a State employee, had the duty to act as a reasonable person to prevent injury to another. This duty was breached when she approved funding for DJ to attend Rock Solid camp, which allowed him to commit a sexual assault on

21

an 8-year-old boy with an intellectual disability. According to plaintiff, not only was this harm reasonably foreseeable, it was "readily anticipated."

DHH also asserts that the jury erred in determining that defendant SC, the mother of the minor DJ, was in the course and scope of her employment with the State when she enrolled DJ in the Rock Solid camp program, when the evidence clearly shows that she independently enrolled her child in camp and that the only assistance provided by the State was simply payment of DJ's tuition to attend the camp.

Plaintiff argues that the issue whether SC was in the course and scope of her employment with the State is "immaterial," since it was Ms. Williams who, in the course and scope of her employment with the State, approved funding for DJ to attend camp. Plaintiffs also point out that the jury did in fact find that SC, in her personal capacity as DJ's mother, bore 5% of the fault for SD's injuries.

While we would specifically address these assignments of error for appellant if we could, there is no evidence that either one of these actually was a factual finding made by the jury in this case. The jury instructions were general, as was the verdict form, and the jury was not required to make such specific findings, but, instead, as to fault/liability on the part of the State, was simply asked:

Do you find that ***the State of Louisiana Department of Health and Hospitals through one of its employees*** was at fault in causing the incident, which is the subject matter of this lawsuit?
Yes _____                    No _____

They answered "Yes." We can only conclude therefrom that the jury found that DHH, through one (or more) of its employees, was at fault. The question whether an employee's tortious conduct is sufficiently

22

employment-related that the factfinder should impose vicarious liability upon the employer is a mixed question of fact and law, and the resolution of that question is entitled to great deference on review by the appellate court under the manifest error standard. *Russell v. Noullet*, 1998-0816 (La. 12/1/98), 721 So. 2d 868; *Reed v. Wal-Mart Stores, Inc.*, 1997-1174 (La. 3/4/98), 708 So. 2d 362.

Louisiana Civil Code article 2320 provides in part that employers are answerable for the damage occasioned by their employees in the exercise of the functions in which they are employed. This liability stems from the broader principles enunciated in La. C.C. art. 2315, which provides, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," and La. C.C. art. 2317, which states, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable[.]" An employer's vicarious liability for conduct not his own extends only to the employee's tortious conduct which occurs within the course and scope of the employment. *Orgeron on Behalf of Orgeron v. McDonald*, 1993-1353 (La. 7/5/94), 639 So. 2d 224; *Payne v. Stanley*, 53,773 (La. App. 2 Cir. 3/3/21), 316 So. 3d 104, *writ denied*, 2021-00480 (La. 5/25/21), 316 So. 3d 445.

In general, an employee is acting within the course and scope of his employment when the conduct is the type he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer. *Timmons v. Silman*, 1999-3264 (La. 5/16/00), 761 So. 2d 507; *Payne, supra*; *Candler v. Henderson*, 48,441 (La. App. 2 Cir. 11/20/13), 128 So. 3d 587, *writ denied*, 2013-2980 (La. 2/28/14), 134 So. 3d 1179.

23

An employer is responsible for the negligent acts of its employee when the conduct is so closely connected in time, place, and causation to the employment duties of the employee that it constitutes a risk of harm attributable to the employer's business. *Orgeron, supra*; *LeBrane v. Lewis*, 292 So. 2d 216 (La. 1974); *Payne, supra*; *Winzer v. Richards*, 50,330 (La. App. 2 Cir. 1/13/16), 185 So. 3d 876.

When employees are performing functions of their employment, it is as though the employer acts through the employee. *Winzer, supra*, citing *Keen v. Pel State Oil Co., Inc.*, 332 So. 2d 286, 290 (La. App. 2 Cir. 1976), *writ denied*, 333 So. 2d 234 (La. 1976). The employer receives the benefit of those acts and so he must shoulder the liability for any wrongs committed during the performance of the acts. *Id.*; *Woolard v. Atkinson*, 43,322 (La. App. 2 Cir. 7/16/08), 988 So. 2d 836.

The jury was provided with an adequate factual basis from which it could have concluded that the DHH, through one of its employees was at fault, i.e., was vicariously liable for the injury sustained by SD in this case.

The record includes, *inter alia*, testimony that DJ, a red-level offender on probation for a violent sexual assault of a child, was at a children's camp contrary to the terms of his probation because of decisions made by his mother and her supervisor, both of whom were aware of the conditions of probation and restrictions imposed upon DJ due to their participation in the ISC process—SC as DJ's mother, and Ms. Williams in the scope of her employment-related duties as coordinator of the ISC process.

SC went to work for the OBH, with Ms. Williams as her direct supervisor. In the course of looking for a summer activity for her children, SC filled out applications for them to attend Rock Solid camp for the

summer of 2010, despite knowledge of her son's criminal history (including the second incident in March 2010) and the probation restrictions imposed upon him. SC asked her supervisor at work for funding for camp for DJ after learning that she could not afford camp tuition for both children. Ms. Williams approved the funding for DJ notwithstanding her own knowledge of DJ's juvenile history and restrictions.

The State's argument that the only thing that Ms. Williams did was fund camp is unpersuasive. While there may have been no breach of Ms. Williams' duty of confidentiality, there is nonetheless sufficient evidence from which the jury could have concluded that her decision to approve funding for DJ to attend a children's day camp with no regard for the potential harm he could cause there constituted a breach of her duty to allocate public funds on behalf of the State in a reasonable manner. The determination to fund an extracurricular activity that involves many other children for a juvenile on probation for a sexual offense against children should necessarily involve contemplation of the potential effects and repercussions that could possibly flow therefrom. Based upon our complete review of the record, we cannot second-guess the jury's determination that, under the particular facts and circumstances of this case, the State bears responsibility for the foreseeable results of reckless decision made by one of its employees.

**Trial Court's Denial of Motion for Directed Verdict**

The State has assigned as error the trial court's denial of its motion for directed verdict, filed at the close of plaintiffs' case. According to DHH, there was no prima facie evidence of fault on the part of the State.

25

Plaintiffs contend they established that, despite actual knowledge of DJ's history of predatory sexual behavior involving younger children, the State nonetheless funded his attendance at Rock Solid. Thus, the jury had evidence from which they have concluded that the State, through an employee of DHH, failed to act as a reasonable person under the circumstances.

A directed verdict is proper when, after considering all evidence presented in the light most favorable to the moving party's opponent, the facts and inferences are so overwhelmingly in favor of a verdict for the movant that the court believes reasonable men could not have arrived at a contrary conclusion. *Harper v. Minor*, 46,871 (La. App. 2 Cir. 2/1/12), 86 So. 3d 690, *writs denied*, 2012-0524, 2012-0528 (La. 4/27/12), 865 So. 3d 629, 632; *Tanner v. Cooksey*, 42,010 (La. App. 2 Cir. 2/6/08), 954 So. 2d 335, *writ denied*, 2007-0961 (La. 6/22/07), 959 So. 2d 508; *Steed v. St. Paul's United Methodist Church*, 31,521 (La. App. 2 Cir. 2/24/99), 728 So. 2d 931, *writ denied*, 1999-0877 (La. 5/7/99), 740 So. 2d 1290. The trial court has much discretion in determining whether to grant a motion for directed verdict. *Harper, supra; Tanner, supra*.

Considering our conclusion that the jury's determination was not manifestly erroneous, the trial court's denial of the State's motion for directed verdict was proper. We pretermit further discussion of this assignment of error. *See*, *Morris v. Rainwater*, 51,108 (La. App. 2 Cir. 1/11/17), 218 So. 3d 226, 235, *writ denied*, 2017-0414 (La. 5/1/17), 220 So. 3d 744.

**Jury's Allocation of Fault**

DHH next assigns as error the jury's allocation of fault. Specifically, DHH contends that the jury erred in assessing 65% of the fault to the State when the evidence showed that Rock Solid had full responsibility for and supervision over the minor children involved at the time of the incident, and it was the decision of Rock Solid camp leaders to put the 8-year-old child SD into a group of older children at the request of and with the express permission of his father CD.

Plaintiffs assert that DHH has failed to show that the jury was clearly wrong in its allocation of fault percentages in this case, considering the nature of the conduct of each party at fault in this case and the extent of the causal connection between their conduct and the damages claimed by plaintiffs.

The fact-finder's allocation of fault is a factual determination. *Malta v. Herbert S. Hiller Corp.*, 2021-00209 (La. 10/10/21), ___ So. 3d ___, 2021 WL 5860859; *Duncan v. Kansas City Southern Railway Co.*, 773 So. 2d 670, 2000-0066 (La. 10/30/00), 773 So. 2d 670; *Clement v. Frey*, 1995-1119 (La. 1/16/96), 666 So. 2d 607. A trier of fact's allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. *Thompson v. Winn-Dixie Montgomery, Inc.*, 2015-0477 (La. 10/14/15), 181 So. 3d 656; *Duncan, supra*.

In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So. 2d 967 (La. 1985); *Upchurch v. State ex rel. La. Dept. of Transportation & Development*,

27

48,354 (La. App. 2 Cir. 8/7/13), 123 So. 3d 228, *writ denied*, 2013-2153 (La. 11/22/13), 126 So. 3d 489; *Goldsby v. Blocker through Dept. of Transportation and Development*, 51,584 (La. App. 2 Cir. 9/27/17), 244 So. 3d 703.

In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and, (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Socorro v. City of New Orleans*, 579 So. 2d 931 (La. 1991); *Watson, supra; Goldsby, supra*.

A reasonable interpretation of the facts supports the jury's finding that the State of Louisiana, DHH, bore a majority of the fault in this case. If DJ had not been at Rock Solid camp, SD would not have been sexually assaulted by him. The testimony was that DJ would not have been at Rock Solid had his mother not had financial assistance or funding to pay for his camp tuition. The source of DJ's financial assistance came from funds available to kids who received mental health services that Ms. Williams coordinated through her employment with OBH, which DJ's mother was aware of because of her own employment with OBH and/or through her son DJ's status as a juvenile receiving probation services for which Ms. Williams served as ISC coordinator. The decision to fund DJ's camp attendance was made in spite of an awareness of the potential risk presented by his presence at the children's camp. We cannot say that the jury erred in

28

allocating 65% of the fault to the State of Louisiana, DHH, under the facts and circumstances of this case.

**Jury's Damage Award**

Finally, we address the State's assignment of error regarding the damages awarded in this case. It is the position of the State, DHH, that the jury's award of $1.25 million in general damages was excessive in light of the evidence presented by plaintiff. Specifically, there was no medical evidence introduced of any physical injury, and the testimony from both mental health professionals established that there were concurrent causes for the minor plaintiff's damages, including, but not limited to his alleged molestation by his stepbrother just months after the incident at Rock Solid, and the congenital condition that has affected his behavior both prior to and after the incident at issue in this case.

On the other hand, plaintiff urges this Court to affirm the jury's award, arguing that it is based on the jury's review of all of the evidence and its evaluation of the witnesses. Plaintiff also points out the reduction of State's liability to $500,000 for damages assessed against it in a case like this one pursuant to La. R.S. 13:5106.

"One injured through the fault of another is entitled to full indemnification for damages caused thereby." *Wainwright v. Fontenot*, 2000-0492 (La. 10/17/00), 774 So. 2d 70, 74, citing *State Farm Mutual Auto. Ins. Co.*, 1998-1011 (La. 4/13/99), 732 So. 2d 1230, 1234; *Koertge v. State Farm Fire and Cas. Ins. Co. v. Berthelot*, 52,503 (La. App. 2 Cir. 2/27/19), 266 So. 3d 441. "A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious

29

conduct." *Wainwright, supra*, citing *American Motorist Ins. Co. v. American Rent-All, Inc.*, 579 So. 2d 429, 433 (La. 1991).

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. *Bellard v. American Central Ins. Co.*, 2007-1335 (La. 4/18/08), 980 So. 2d 654; *Duncan, supra; Koertge, supra.*

There is no mechanical rule for determining general damages. The facts and circumstances of each case control. *Koertge, supra*; *Terry v. Simmons*, 51,200 (La. App. 2 Cir. 2/15/17), 215 So. 3d 410; *Guerrero v. Brookshire Grocery Co.*, 49,707 (La. App. 2 Cir. 4/29/15), 165 So. 3d 1092. The nature, relative severity and bodily extent of injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. *Koertge, supra*; *Terry, supra; Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245; *Caldwell v. ANPAC Inc. Co.*, 50,333 (La. App. 2 Cir. 1/13/16), 185 So. 3d 846. The duration of a plaintiff's symptoms and the duration of treatment are relevant quantitative factors that must also be taken into account. *Koertge, supra*; *Terry, supra*.

Vast discretion is left to the trier of fact in the assessment of general damages. La. C.C. art. 2324.1. The role of an appellate court in reviewing an award of damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Boothe v. Dept. of Transportation and Development and Parish of East Baton Rouge*, 2018-1746 (La. 6/26/19), 285 So. 3d 451; *Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257 (La. 1993); *Reck v. Stevens*, 373 So. 2d

498 (La. 1979). Because each case is different, the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. *Youn*, *supra*; *Renard v. McCloud*, 35,633 (La. App. 2 Cir. 5/8/02), 818 So. 2d 279.

The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the much discretion of the trier of fact. *Youn*, *supra*; *Reck*, *supra.* It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reasons, be considered either excessive or insufficient. *Youn*, *supra*; *Reck*, *supra*; *Dennis v. Turner*, 35,553 (La. App. 2 Cir. 1/23/02), 806 So. 2d 942.

It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. *Youn*, *supra*; *Coco v. Winston Industries, Inc.*, 341 So. 2d 332 (La. 1976). In reviewing the facts, the reviewing court should examine whether the present award is greatly disproportionate to past awards for similar injuries, though prior awards are only a guide. *Boothe, supra*; *Bouquet v. Wal-Mart Stores, Inc.*, 2008-0309 (La. 4/4/08), 979 So. 2d 456.

SD received counseling from Bonnie Howell at Gingerbread House that began soon after the incident and ended in November 2015, and since then, he has treated with Dr. Bruce McCormick and a counselor in Dr. McCormick's practice. Ms. Howell testified that the incident at Rock Solid definitely left a mark on SD. He will be able to get better, but will never

forget what happened to him. She stated that SD's school troubles, such as lying and stealing, could have been related to the molestation, but that his disabilities and his father's divorce also could have been affecting his behavior as well. The testimony from Dr. McCormick was equivocal as to the effect that this incident had on SD's mental health and behavior, since there were other contributing causes that could not be separated out: SD's Cornelia de Lange syndrome, trauma caused by his mother's abandonment, his father's remarriage, a subsequent sexual assault (or attempted assault) by his stepbrother, and his father's divorce. Dr. McCormick also noted, however, that on the last date that he had seen SD, February 3, 2020, he appeared to be doing well.

CD testified that as of trial, SD was still seeing a counselor at Dr. McCormick's office. CD admitted that SD has behavioral issues and trauma from his mother's abandonment, and that it is hard to relate all of SD's counseling to the Rock Solid incident. However, his son has never been the same since that day. Nonetheless, he testified that he sent his boys back to Rock Solid that summer after the incident, as well as the following summer, because they all wanted to go back, and to him, the threat was gone. According to CD, SD is angrier and more negative, and his whole demeanor and attitude are different. He takes prescription medication and participates in karate, both of which help with SD's anger.

While this Court agrees that SD sustained significant mental trauma as a result of the incident at Rock Solid, he did not sustain any physical injuries as a result thereof, and the evidence introduced at trial did not establish that his mental health treatment has been necessary solely because of injury sustained as a result of the incident at Rock Solid. Under the facts and

32

circumstances of this case, we find that the jury abused its discretion in awarding $1.25 million in general damages to SD.

Having found that the jury abused its discretion in fixing the amount of SD's general damage award, we will set the award in accordance with *Coco,* 341 So. 2d at 335, i.e., we will lower it to the highest point that is reasonably within the discretion afforded to the trier of fact. First, we will examine several cases involving similar claims and injuries.

In *Doe v. ABC School*, 2019-0983 (La. App. 1 Cir. 12/17/20), 316 So. 3d 1086, *writ denied*, 2021-00098 (La. 3/9/21), 312 So. 3d 582, the First Circuit affirmed the trial court's award of a $350,000 general damage award for "mental and physical pain, anguish and suffering" to a fourth grade special education student who was molested and raped during school hours in the school bathroom by the janitor. After the rape, the janitor threatened to kill the child and his family if the child told anyone. The child, who had dyslexia and a learning disorder which impeded his ability to communicate with teachers and students, did not report the assault, which only came to light after other students reported having been assaulted by the janitor. "He was called upon to testify regarding all the details to a jury of twelve men and women in 2009 when [the janitor] was convicted of rape. He has been treated and interviewed by … experts for the past 10½ years [who] have been privy to the personal details that would horrify any [11-year-old] boy into complete silence." *Doe*, 316 So. 3d at 1100. The child finished that school year in a home-school program. He was unsuccessful in returning to public school during his elementary school years. He returned to public school during junior high and high school, but was held back one year, and unable to graduate after lacking credits after repeating 11th grade. The

33

record contains evidence of a documented toll on his mental and physical health, including exacerbation of severe gastrointestinal tract issues, and problems with sleepwalking and night terrors. As an adult, he is only able to work because his father provides him with a job and makes allowances for his psychological and physiological needs. This case involved physical injuries, which the case at issue does not, so it is not directly on point.

In *Pike v. Calcasieu Parish School Board*, 2018-996 (La. App. 3 Cir. 5/15/19), 272 So. 3d 943, *writ denied*, 2019-01196 (La. 10/15/19), 280 So. 3d 611, the appellate court reduced a $500,000 award for general damages to $200,000 in a case involving psychological damage to a first-grade student sexually abused by an older student on a school bus. The child had changes in behavior, a change in his personality, required continual counseling, and had to move to a private school. The Third Circuit observed, "We conclude that an award of $500,000.00 is abusively high. B.P. has suffered psychic trauma as a result of this incident, but he continues to improve. His schooling situation has remained stable…. By all appearances, he continues to have issues with behavior at school, but he had those issues before this incident according to Ms. Thibodeaux, whose testimony was not contradicted." *Pike*, *supra* at 952. This case, among the many we reviewed, while distinguishable, comes closest to the facts and circumstances under consideration by this Court as it contemplates the highest point reasonably within the discretion afforded to the trier of fact.[5]

---

[5] *See also, Doe ex rel. Doe vs. DeSoto Parish School Board*, 39,799 (La. App. 2 Cir. 6/29/05), 907 So. 2d 275, *writ denied*, 2005-2020 (La. 2/10/06), 924 So. 2d 167, a case involving much more egregious facts and circumstances in which this Court affirmed a jury's award of $50,000 for past physical pain and suffering and $200,000 for past and future mental anguish and loss of enjoyment of life to a young claimant arising out of her participation in sexual activity with five older students on a school bus returning home from a basketball game. The facts established that she had the emotional

Considering the facts and circumstances of the instant case, and after having examined the above prior cases with similar awards, this Court finds that the highest award reasonably within the jury's discretion for general damages under the facts and circumstances of this case is $250,000.

## CONCLUSION

Based on the jury's abuse of discretion in its award of general damages, the excessive award of $1.25 million to plaintiff CD on behalf of his minor child SD is reduced to $250,000. This requires amendment of the trial court's judgment entered in accordance with the jury's initial award, which will not only reduce the amount owed by the State of Louisiana, but also the amount for which the other defendants are responsible.

## DECREE

For the foregoing reasons, the trial court's judgment is amended to reduce the general damages awarded on behalf of SD to plaintiff, CD individually and on behalf of SD, from $1.25 million to $250,000. In all other respects, the judgment of the trial court is affirmed.

It is HEREBY ORDERED, ADJUDGED, AND DECREED that there be a judgment in favor of plaintiff, CD, individually and as tutor of his minor child SD, and against defendant, State of Louisiana, Department of Health and Hospitals, in the amount of ONE HUNDRED SIXTY-TWO THOUSAND FIVE HUNDRED DOLLARS ($162,500) plus judicial interest as set forth in La. R.S. 13:5112.

---

maturity of a 10- to 11-year-old and I.Q. scores ranging from a 70 to 79. This Court noted the physical ordeal endured by the young claimant, and the jury's ability to analyze the psychological evidence offered (which was not discussed in the opinion) as well as its ability to observe the claimant's demeanor and overall well-being.

It is HEREBY ORDERED, ADJUDGED, AND DECREED that there be a judgment in favor of plaintiff, CD, individually and as tutor of his minor child, SD, and against defendant, Rock Solid Camps, LLC, in the amount of SEVENTY-FIVE THOUSAND DOLLARS ($75,000) plus judicial interest from date of judicial demand.

It is HEREBY ORDERED, ADJUDGED, AND DECREED that there be a judgment in favor of plaintiff, CD, individually and as tutor of his minor child, SD, and against defendant, SC, individually and as the parent and guardian of DJ, in the amount of TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500) plus judicial interest from date of judicial demand.

Costs of this appeal will not be assessed.  See La. C.C.P. art. 2164; La. R.S. 40:31.

AMENDED IN PART, AND, AS AMENDED, AFFIRMED.

**PITMAN, J., dissents**.

I respectfully dissent from the majority opinion. The general damage award was decided by a jury, which heard all the testimony and viewed the evidence before making its determination. After the trial, the trial court heard arguments on a motion for new trial or, alternatively, remittitur, filed by Defendants, and denied the motions.

While the general damages awarded are higher than I may have awarded as trier of fact, it must be determined if the trier of fact abused its discretion in making the award.

The majority has found there was no manifest error in the jury's allocation of fault, but that the amount of the general award was excessive. I agree with the allocation of fault, but disagree that the award is excessive.

The plaintiff, S.D., was a young boy at the time he was sexually assaulted by an older boy who was a known serial sexual predator. S.D. has Cornelia de Lange Syndrome and accompanying cognitive deficits. The State of Louisiana; Department of Health and Hospitals; Rock Solid Camps, L.L.C.; and S.C. were all found to be negligent. At trial, S.D.'s father described his son as never being the same after the sexual assault.

In *Renard v. McCloud*, 35,633 (La. App. 2 Cir. 5/8/02), 818 So. 2d 279, our court stated:

> In making damage awards, the discretion of the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. *Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257 (La. 1993), *cert. denied*, 510 U.S. 1114, 114 S. Ct. 1059, 127 L. Ed. 2d 379 (1994); *Methvin v. Ferguson*, 35,138 (La. App. 2d Cir. 9/26/01), 796 So. 2d 712. Our role is not to decide what we consider to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Youn*, *supra*. Each case is different and the adequacy or the inadequacy of the award should be determined by the facts and circumstances particular

1

to the case under consideration.  In reviewing a damage award, the initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the much discretion of the trier of fact.  *Youn*, *supra*.

I believe the jury award was not a clear abuse of discretion.  As stated previously, our role as a court of appeal is not to decide what we consider to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.

For this reason, I must respectfully dissent against lowering the general damage award, but agree we should affirm the trial court in finding Defendants liable to S.D.